BOETTCHER & COMPANY, INC., and Craig L. Carson, Petitioners,

v.

Margaret H. MUNSON, individually and as co-trustee for the William R. Munson Trust; W.A. Munson, as co-trustee and as attorney-in-fact for Marion Gotschall, co-trustee of the William R. Munson Trust, Respondents.

No. 92SC15.

Supreme Court of Colorado, En Banc.

June 7, 1993.

As Modified on Denial of Rehearing July 6, 1993.

---

Davis, Graham & Stubbs, Richard P. Holme, Alan M. Loeb, Lisa S. Kahn, Denver, for petitioners.

Gersh & Danielson, Miles M. Gersh, Robin C. Truitt, James S. Helfrich, Denver, for respondents.

Cooper & Kelley, P.C., John R. Mann, Denver, for amicus curiae Colorado Defense Lawyers Ass'n.

Arter & Hadden, Samuel J. Winer, Mark J. Botti, Washington, DC, Cortez Friedman & Coombe, P.C., Miles C. Cortez, Jr., Denver, for amicus curiae Securities Industry Ass'n.

Netzorg & McKeever, P.C., J. Nicholas McKeever, Jr., Englewood, for amicus curiae Colorado Trial Lawyers Ass'n.

Joseph C. Long, Norman, OK, Pryor, Carney and Johnson, Bradford J. Lam, Englewood, for amicus curiae North American Securities Administrators Ass'n, Inc.

Justice VOLLACK delivered the Opinion of the Court.

Petitioners Boettcher & Company, Inc., and Craig L. Carson (jointly referred to as "Boettcher") petition from the court of appeals opinion in *Munson v. Boettcher & Company, Inc.*, 832 P.2d 967 (Colo.App. 1991). Margaret Munson and the William R. Munson Trust filed an action against Boettcher, alleging several violations of Colorado securities laws. The district court entered judgment on a jury verdict in favor of Munson only on one claim for relief and Munson appealed. The court of appeals held, among other things, that the district court improperly admitted evidence of Munson's income tax liability, and that the district court improperly excluded evidence of Boettcher's prior acts of defrauding other investors. We affirm, and remand the case to the court of appeals with directions.

## I.

In 1977, Margaret Munson's husband died. Margaret Munson (Munson) subsequently sold the family farm for approximately $825,000. In 1979, Munson asked her son William whether she should invest the proceeds of the farm sale or leave the proceeds in certificate of deposit accounts. William directed Munson to contact Boettcher.

William and Munson first met with Boettcher on December 13, 1979. Munson informed Boettcher of her "situation, that [she] had some money that [she] thought [she] should earn something on and not pay it all out to taxes and it should grow and be safe." Munson subsequently opened an in-

dividual account with Boettcher. In 1981, Munson opened a trust account with Boettcher that was funded through provisions in Munson's husband's will.

Beginning in 1979 and continuing through 1987, Boettcher recommended that Munson purchase interests in a series of limited partnerships which Munson agreed to purchase. Boettcher also recommended that the trust purchase interests in some of the same limited partnerships, which the trust purchased. In 1986, Munson became concerned about the performance of her investments, and in 1987, she closed her account with Boettcher.

In 1988, Munson and the trust filed an action against Boettcher, alleging that: (1) Boettcher defrauded Munson in violation of sections 11–51–123 and 11–51–125 of the Colorado Securities Act; (2) Boettcher breached its fiduciary duty to Munson; (3) Boettcher knowingly or recklessly made false representations to Munson; and (4) Boettcher was negligent. Munson sought damages of approximately $389,300. The action proceeded to a trial, which commenced on August 8, 1989.

At trial, Munson testified that she was sixty-seven years old when she first approached Boettcher, and had one year of college business courses, including typing and shorthand. Munson testified that she had never worked outside of the family farm, and had never prepared her own income tax returns. Munson called Robert F. Kutchera (Kutchera), a certified public accountant, as a witness. Kutchera testified regarding the amount of tax benefits Munson received while owning interests in the limited partnerships. Kutchera also provided an opinion regarding the worth of Munson's portfolio had the portfolio been properly invested.

Munson sought to introduce the testimony of three potential witnesses at trial. Munson made an offer of proof that each witness would testify that Boettcher had a pattern and practice of inappropriately recommending that its clients purchase interests in limited partnership investments despite the fact that the individual investors valued safety as an investment goal. Munson also contended that the testimony of the three witnesses would prove that there was no supervision by Boettcher to protect the individual investors. The district court ruled that the proffered testimony of Boettcher's prior acts regarding different individual investors was not admissible under CRE 404(b).

Boettcher produced Wiley Hairgrove (Hairgrove), a certified public accountant and certified financial planner, as an expert witness in accounting. Hairgrove testified, among other things, that the damages sustained by Munson, according to Kutchera's testimony, should have been reduced by the amount of income taxes that Munson would have had to pay on interest earned by the account throughout the relevant time period.

At the close of trial, Munson tendered an instruction "which state[d] simply that [the jury] should not include or subtract any amount because of taxes paid or to be paid." Counsel for Munson argued that "[they] fe[lt] that allowing the jury to roam at will in the area of taxes without instruction is error." The district court found "that taxation certainly is an issue and must be considered by the jury in determining whether or not the plaintiffs were damaged.... While the court agrees it's a law in the State of Colorado that the jury should not compute or attempt to compute a tax incident on the amount of the verdict itself, it's impossible to determine this case without arguing the tax impact of the various transactions." The district court denied Munson's tendered instruction.

The jury found that Boettcher breached its fiduciary duty to Munson and to the trust, and awarded damages in the amount of $22,549 and $17,001, respectively. The jury conversely determined that Boettcher was not negligent and did not violate the Colorado Securities Act. The district court entered a judgment on the verdict, and Munson appealed.

Munson argued to the court of appeals that the district court erred by allowing the jury to consider and reduce a damages award by the amount of tax benefits she received insofar as the limited partnerships provided tax shelters. The court of appeals agreed. *Munson v. Boettcher & Co.*, 832 P.2d 967, 969–70 (Colo.App.1991). The court of appeals considered the effect of the tax benefit rule, which requires plaintiffs to file amended tax returns after recovering judgments. The court of appeals concluded that reducing a damage award by the amount of any tax benefits received by Munson would unfairly benefit the defendants and may exceed the damage award, thus resulting in no damage award to Munson. *Id.*[1]

Munson also argued "that, in calculating the damage award based on a hypothetical investment portfolio, the award of damages should not be reduced by the taxes which might have been owed on gains from investments in that portfolio." *Id.* at 970. The court of appeals agreed. The court of appeals reasoned that damage awards are taxable when received, and that reducing the damages award by income taxes owed would subject Munson to double taxation. *Id.*

Munson contended that the district court erred in refusing the testimony of the three witnesses proffered under CRE 404(b). *Id.* The court of appeals reviewed Munson's offer of proof and concluded that the probative value of the evidence was not substantially outweighed by its prejudicial effect. *Id.* at 971. The court of appeals reversed the damages award for breach of fiduciary duty, and reversed the judgment on Munson's fraud claim and violation of the Colorado Securities Act. The court of appeals remanded the case for a new trial on damages for the breach of the fiduciary duty, and on liability and damages for fraud and violation of the Colorado Securities Act. *Id.*

Boettcher filed a petition for certiorari, which we granted. We individually address each argument raised.

---

**1.** This ruling was not appealed.

## II.

## INCOME TAX CONSEQUENCES AND DAMAGE AWARDS

Boettcher contends that the court of appeals erred by ruling that fact finders cannot consider income taxes that an investor would have been required to pay during a multi-year investment. Rather, Boettcher asserts that the district court properly admitted expert testimony that Munson only suffered damages to the extent that she would have had to pay income tax on earned interest. Boettcher contends that not permitting the fact finder to consider evidence of income taxes owed during the relevant time period gives Munson a tremendous windfall.

We have not previously considered whether evidence of income tax liability is relevant to a damage award in an action premised on both Colorado securities laws and common law. Federal cases addressing *income tax liability* and damage awards hold that such liability should not be considered by fact finders because plaintiffs would otherwise be subject to double taxation. Policies underlying the *tax benefit rule*—of restoring defrauded investors to their original positions, and preventing further exploitation of the public—reach the same result. We find these authorities persuasive in our application of Colorado law, and we affirm the court of appeals ruling.

### A.

### *The Tax Benefit Rule*

The relief sought by Munson is based in part on section 11–51–125(2) of the Securities Act of 1981, which provides:

> Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11–51–123 is liable to the person buying or selling a security in connection with the violation for such legal or equitable relief which the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

§ 11–51–125(2), 4B C.R.S. (1987).[2] We have recognized that federal authorities are highly persuasive when the Colorado Securities Act parallels federal enactments. *Lowery v. Ford Hill Investment, Co.*, 192 Colo. 125, 129–30, 556 P.2d 1201, 1204 (1976) (relying on *Sauer v. Hayes*, 36 Colo. App. 190, 539 P.2d 1343 (1975); *Mr. Steak, Inc. v. River City Steak, Inc.*, 324 F.Supp. 640 (D.Colo.1970), *aff'd*, 460 F.2d 666 (10th Cir.1972)). Section 11–51–125 "appears to be the analogue of section 12 of the federal securities act of 1933 (the 1933 Act)." *Kerby v. Commodity Resources Inc.*, 395 F.Supp. 786 (D.Colo.1975). Like section 11–51–125, "[s]ection 12(2) specifies the conduct that gives rise to liability for prospectus fraud and expressly creates a private right of action in favor of the defrauded investor." *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).

In interpreting section 12 of the 1933 Act, the United States Supreme Court considered whether fact finders should be permitted to evaluate tax *benefits*.[3] *Id.* The Supreme Court granted certiorari in that case "because the Courts of Appeal are divided in their treatment of tax benefits for purposes of calculating damages in federal securities fraud litigation." *Id.* at 655, 106 S.Ct. at 3148. The Supreme Court noted the conflicting results reached in the case on appeal, *Austin v. Loftsgaarden,*

**2.** Munson additionally sought relief in part based on § 11–51–123, 4B C.R.S. (1987), provides:

> **Fraudulent and other prohibited practices.** (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
> (2) The practices prohibited by subsection (1) of this section shall include, but are not limited to, effecting a transaction or a series of transactions in securities that:

675 F.2d 168 (8th Cir.1982), and *Burgess v. Premier Corp.*, 727 F.2d 826 (9th Cir.1984).

In *Burgess*, five doctors purchased tax shelter investments in cattle herds from Premier Corp. *Burgess*, 727 F.2d at 830. After losing money on their investments for several years, the doctors filed an action against Premier, claiming that Premier violated federal and state securities laws by failing to disclose the low quality of the cattle, among other things. The district court entered summary judgment in favor of the doctors, and Premier appealed.

On appeal, the Ninth Circuit Court of Appeals noted that "[t]he purpose of the damages is to place the doctors in as good a position financially as that in which they would have been had they not made the transaction, *i.e.*, to accomplish rescission." *Id.* at 838. The Ninth Circuit Court found that

> to simply subtract the tax benefits from damages would place an unfair burden on taxpayers generally. Specifically, the doctors would only be returned to their original position by maintaining their claimed tax losses in addition to the out of pocket losses awarded. Such a result leaves the government bearing the cost of defendants' fraud. A better result is to set damages equal to the doctors' losses exclusive of tax benefit. The doctors will not receive a double benefit from this measure of damages because under the tax benefit rule, their prior tax bene-

> (a) Raises the price for the purpose of inducing the purchase of a security (whether of the same or of a different class) of the same issuer (or of a controlling, controlled, or commonly controlled company) by others;
> (b) Depresses the price for the purpose of inducing the sale of a security (whether of the same or of a different class) of the same issuer (or of a controlling, controlled, or commonly controlled company) by others; or
> (c) Creates active trading (actual or apparent) for the purpose of inducing such a purchase or sale.

**3.** The plaintiff in *Randall v. Loftsgaarden*, 478 U.S. 647, 649, 106 S.Ct. 3143, 3144, 92 L.Ed.2d 525 (1986), presented claims under both § 12(2) of the Securities Act of 1933 and under § 10(b) of the Securities Exchange Act of 1934. The *Randall* Court, however, limited its analysis to an interpretation of § 12(2). *Id.* at 655–60, 106 S.Ct. at 3148–51.

fits will be disallowed. Although this court cannot directly disallow the prior tax benefits because plaintiffs' tax liabilities are not directly before us, we presume that the IRS will do its duty if the doctors should actually recover on their judgments and thereafter fail to file amended returns as required by law.

*Id.* The Ninth Circuit Court concluded that consideration of tax benefits received was inappropriate.

The Ninth Circuit Court observed that the Eighth Circuit Court of Appeals reached a contrary conclusion in *Austin* by relying on the argument that excluding such information would "requir[e] the jury and the Court to live in an artificial 'never-never land.'" *Id.* (quoting *Austin*, 675 F.2d at 182). The Ninth Circuit Court concluded by stating "that the economic benefit by way of tax deductions is illusory because amended returns will have to be filed." *Id.* (citing Mertens *Law of Federal Income Tax* § 7.37).

After recognizing the conflict between the circuits, the United States Supreme Court reached the same result in *Randall* as that reached by the Ninth Circuit Court. *Randall*, 478 U.S. at 655–60, 106 S.Ct. at 3148–51. The *Randall* Court stated that the issue before it was

> whether the recovery available to a defrauded tax shelter investor, entitled under § 12(2) of the Securities Act of 1933 or § 10(b) of the Securities Exchange Act of 1934 to rescind the fraudulent transaction or obtain rescissory damages, must be reduced by any tax benefits the investor has received from the tax shelter investment.

*Id.* at 649, 106 S.Ct. at 3146. The *Randall* Court noted that, under section 12(2), the measure of damages is "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* at 655, 106 S.Ct. at 3149.

The *Randall* Court concluded that section 12(2) dictates that the appropriate remedy is rescission unless the defrauded investor no longer owns the security. *Id.*

Loftsgaarden was the president and sole shareholder of a limited partnership, which was marketed as a tax shelter. *Id.* at 650, 106 S.Ct. at 3146. Loftsgaarden contended to the Supreme Court that rescission served the exclusive purpose of restoring a party to the *status quo ante*, and " 'any person demanding the rescission of a contract to which he is a party must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property, or other consideration or benefit.' " *Id.* at 658, 106 S.Ct. at 3150 (quoting 2 H. Black, *Rescission of Contracts and Cancellation of Written Instruments* § 617, at 1417 (1916)). Loftsgaarden argued that any "consideration or benefit" includes tax benefits. Loftsgaarden argued that tax benefits must be accounted for in order to return the injured party to the *status quo ante*.

The *Randall* Court disagreed, and concluded that Loftsgaarden's

> view of [the rescission remedy] is ... flawed. Certainly a restoration of the plaintiff to his position prior to the fraud is *one* goal that will generally be served by § 12(2), as by common law rescission or restitution. But the 1933 Act is intended to do more than ensure that defrauded investors will be compensated: the Act also "aim[s] ... to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor."

*Id.* at 659, 106 S.Ct. at 3150–51 (quoting S.Rep. No. 47, 73d Cong., 1st Sess., 1 (1933)) (relying on *United States v. Naftalin*, 441 U.S. 768, 775–76, 99 S.Ct. 2077, 2082–83, 60 L.Ed.2d 624 (1979)).[4] Thus the *Randall* Court held that section 12(2) does

---

**4.** The *Randall* Court also concluded that, "by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud." *Id.*

not authorize an offset of tax benefits received by a defrauded investor against the investor's rescissory recovery. *Id.*, 478 U.S. at 660, 106 S.Ct. at 3151.

In determining whether section 28(a) of the 1934 Act altered its interpretation of section 12(2), the *Randall* Court addressed Loftsgaarden's contention that plaintiffs would receive windfalls absent an offset for tax benefits. The *Randall* Court recognized that, in cases of rescission, any recovery received by plaintiffs would be taxable as ordinary income. *Id.* at 664, 106 S.Ct. at 3153. "Any residual gains to plaintiff thus emerge more as a function of the operation of the Internal Revenue Code's complex provisions than of an unduly generous damages standard for defrauded investors." *Id.* at 664, 106 S.Ct. at 3153.

In the present case, however, Boettcher contests the court of appeals ruling regarding the amount of income tax Munson would have been required to pay during the years in question, or Munson's *income tax liability*. We find that the *Randall* Court's interpretation of section 12 of the 1933 Act, considered with federal authority concerning *income tax liability*, provides the appropriate framework with which to resolve the present issue.

### B.

#### Income Tax Liability

The United States Supreme Court considered whether *income tax liability* should be part of a damages award generally in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Hanover Shoe, Inc. (Hanover), manufactured shoes and purchased machinery from United Shoe Machinery Corp. (United). Hanover filed an action against United, alleging that United monopolized the shoe machinery industry in contravention of section 2 of the Sherman Act, and that United's practice of leasing but not selling complicated and important shoe machinery was an instrument of the unlawful monopolization. *Id.* at 483,

88 S.Ct. at 2226. Hanover sought to recover the difference between the amount it paid in shoe machine rentals and the amount it would have paid to purchase the machines during the relevant time period. The District Court found in favor of Hanover, and United appealed. The Court of Appeals affirmed the District Court's ruling regarding liability, but disagreed with the District Court's damages award. The Court of Appeals directed the District Court to consider the amount of income taxes Hanover would have been required to pay during the years in question if Hanover had purchased the machines rather than rented them. Hanover argued to the United States Supreme Court that this ruling was in error.

The *Hanover Shoe* Court observed that the Court of Appeals "evidently felt that ... Hanover was damaged only to the extent of the after-tax profits that it failed to receive." *Id.* at 502–03, 88 S.Ct. at 2236. The *Hanover Shoe* Court stated:

> The view of the Court of Appeals is sound in theory, but it overlooks the fact that in practice the Internal Revenue Service has taxed recoveries for tortious deprivation of profits at the time the recoveries are made, not by reopening the earlier years. *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 [75 S.Ct. 473, 99 L.Ed. 483] (1955). As Hanover points out, ... to diminish the actual damages by the amount of the taxes that it would have paid had it received greater profits in the years it was damaged would be to apply a double deduction for taxation, leaving Hanover with less income than it would have had if United had not injured it.

*Id.* The *Hanover Shoe* Court found that taxing recovery when received was the most satisfactory solution in light of the fact that recomputing the amount of taxes owed after a long period of intervention would be immensely difficult or impossible. *Id.* The *Hanover Shoe* Court thus reversed the Court of Appeals insofar as it required a recomputation.[5]

---

**5.** The United States Claims Court followed the *Hanover Shoe, Inc. v. United Shoe Machinery*

*Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), decision with regard to income tax

■ The rationale applied by the *Hanover Shoe* Court persuades us that the district court improperly permitted the jury to consider evidence of Munson's hypothetical income tax payments during the years in question when determining the amount of damages.

### C.

### *Munson's Income Tax Liability*

In the present case, Boettcher presented the testimony of Hairgrove, an accounting expert, at trial. Hairgrove adjusted Munson's expert's, Kutchera's, damage calculations to take into account Munson's income tax liability. Hairgrove testified as to the tax rate for the relevant years, and testified as to the amount of damages Munson sustained after reducing that amount by taxes saved and income taxes paid. Munson sought to exclude such evidence from the jury's consideration through an instruction, but the district court declined to give the jury the instruction.

Munson argued on appeal that the jury should not have been permitted to reduce a damage award by the amount of taxes owed on gains from a hypothetical investment portfolio. *Munson,* 832 P.2d at 970. The court of appeals found that "amounts received as damages in litigation are ordinary income for income tax purposes." *Id.* (relying on 26 U.S.C. § 61 (1982); *Jones v. Corbyn,* 186 F.2d 450 (10th Cir.1950)). The court of appeals concluded that Munson's income tax liability was not relevant to the issue of damages because a contrary result would subject Munson to double taxation and because "the record is devoid of any applicable tax laws, IRS provisions, or tax regulations which would assist the jury in determining whether plaintiffs had any tax liability." *Id.*

■ We agree. Like the federal securities act, sections 11–51–123 and 11–51–125 of the Colorado Securities Act serve to restore the defrauded investor to the *status quo ante* and to "prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities

through misrepresentation [and] to place adequate and true information before the investor." *Randall,* 478 U.S. at 659, 106 S.Ct. at 3151. A deduction of income taxes owed would defeat both the language of section 11–51–125(2), which authorizes district courts to fashion appropriate relief, "including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees," and the purposes served by damage awards in securities fraud actions. § 11–51–125(2).

Additionally, a reduction of the damages award in the present case by Munson's hypothetical income tax liability would amount to a double deduction for taxation. We decline to condone deduction of hypothetical income taxes owed when the result may leave Munson with less income than she would have had if Boettcher had not injured her and when the result may unfairly benefit Boettcher for amounts Munson may owe to the Internal Revenue Service. *See Hanover Shoe,* 392 U.S. at 503, 88 S.Ct. at 2236. We thus reject Boettcher's contention that Munson will receive a tremendous windfall. Any windfall is illusory, as Munson would be required to file amended tax returns upon receipt of the damages award. *See Burgess,* 727 F.2d at 838 (relying on Mertens *Law of Federal Income Tax* § 7.37; *Western Federal Corp. v. Davis,* 553 F.Supp. 818 (D.Ariz. 1982)).

We find that any income tax owed by Munson for income received during the period in question is a matter between Munson and the Internal Revenue Service, and not a matter before the district court in the present case.

### III.

### EVIDENCE OF OTHER ACTS

Boettcher contends that the court of appeals erred by ruling that evidence of similar unsuitability investment transactions should have been admitted under CRE 404(b). *Munson,* 832 P.2d at 970. We disagree. Based upon consideration of

liability in *ITT Corporation v. United States,* 17 Cl.Ct. 199 (1989).

fraud claims premised on unsuitability, and upon CRE 404(b), we conclude that such evidence may be admissible when a defrauded investor seeks to prove that a broker engaged in a course of business of recommending unsuitable investments to its clients, which operated as a fraud upon the investor in contravention of the Colorado Securities Act. We affirm the judgment of the court of appeals but for different reasons.

## A.

### *Unsuitability and Fraudulent Practices*

Like section 10(b) of the 1934 Securities Exchange Act, section 11–51–123 of the Colorado Securities Act makes it unlawful for any person, in connection with the purchase or sale of a security, to engage in a course of business which operates as a fraud upon any person.[6] § 11–51–123, 4B C.R.S. (1987); *see* 17 C.F.R. § 240.10b–5 (1992); *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 896 (10th Cir. 1992) (noting that section 11–51–123 is a state analogue to the 1934 Securities Exchange Act). The purpose of rule 10b–5 is "to ensure that investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities." *Securities and Exch. Comm'n v. Hasho*, 784 F.Supp. 1059, 1106 (S.D.N.Y.1992) (relying on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). Thus, in order to prove fraud under 10b–5, a plaintiff must show "that in connection with the purchase or sale of a security—the broker made an untrue statement of a material fact, or failed to state a material fact." *O'Connor*, 965 F.2d at 897 (relying on *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992)). A plaintiff must also show "that in so doing, the broker acted knowingly with the intent to deceive or defraud." *Id.; see Farlow*, 956 F.2d at 986. A plaintiff must additionally prove that he or she "relied on the misrepresentations, and sustained damages as a proximate result of the misrepresentations." *Id.; see Farlow*, 956 F.2d at 986.

Defrauded investors may, as in the present case, premise allegations of fraud upon claims of unsuitability.[7] *Clark*

---

6. Section 11–51–123 provides as follows:

    **Fraudulent and other prohibited practices.** (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

    (a) To employ any device, scheme, or artifice to defraud;

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

    (2) The practices prohibited by subsection (1) of this section shall include, but are not limited to, effecting a transaction or a series of transactions in securities that:

    (a) Raises the price for the purpose of inducing the purchase of a security (whether of the same or of a different class) of the same issuer (or of a controlling, controlled, or commonly controlled company) by others;

    (b) Depresses the price for the purpose of inducing the sale of a security (whether of the same or of a different class) of the same issuer (or of a controlling, controlled, or commonly controlled company) by others; or

    (c) Creates active trading (actual or apparent) for the purpose of inducing such a purchase or sale.

    § 11–51–123, 4B C.R.S. (1987); *see* § 11–51–501, 4B C.R.S. (1992 Supp.).

    C.F.R. § 240.10b–5 similarly provides:

    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

    in connection with the purchase or sale of any security.

    17 C.F.R. § 240.10b–5 (1992).

7. In her complaint, Munson alleged that "[t]he fraudulent or reckless plan, scheme and state of mind of [Boettcher] is reflected in the pattern of representations made by [Boettcher] to other Boettcher customers at or about the same peri-

*v. John Lamula Investors, Inc.*, 583 F.2d 594, 599–600 (2d Cir.1978) (recognizing a violation of rule 10b–5 premised upon knowingly recommending unsuitable securities); *see Lefkowitz v. Smith Barney, Harris Upham & Co.*, 804 F.2d 154, 155 (1st Cir.1986); *Eickhorst v. E.F. Hutton Group, Inc.*, 763 F.Supp. 1196, 1200–01 (S.D.N.Y.1990). The Tenth Circuit Court of Appeals has noted that "[t]he unsuitability doctrine is premised on New York Stock Exchange Rule 405—Know Your Customer Rule and the National Association of Securities Dealers Rules of Fair Practice."[8] *O'Connor*, 965 F.2d at 897 (footnote omitted). The gravamen of a fraud claim premised on unsuitability is that a broker recommended an investment to an investor while knowing, or reasonably believing, that the investment was not suited to the investor's needs. *Eickhorst*, 763 F.Supp. at 1200 (relying on *Clark*, 583 F.2d at 600). The *O'Connor* Court noted that

[s]ome courts examining a § 10(b), Rule 10(b)–5 unsuitability claim have analyzed it simply as a misrepresentation or failure to disclose a material fact. *See, e.g., Lefkowitz v. Smith, Barney, Harris Upham & Co., Inc.*, 804 F.2d 154, 155 (1st

Cir.1986). In such a case, the broker has omitted telling the investor the recommendation is unsuitable for the investor's interests. The court may then use traditional laws concerning omission to examine the claim.

*O'Connor*, 965 F.2d at 897. The *O'Connor* Court adopted three elements to establish "unsuitability based on *fraud by conduct.*" *Id.* at 898 (emphasis added).

The plaintiff must prove (1) the broker recommended (or in the case of a discretionary account purchased) securities which are unsuitable in light of the investor's objectives; (2) the broker recommended or purchased the securities with an intent to defraud or with reckless disregard for the investor's interests; and (3) the broker exercised control over the investor's account.

*Id.* We find, however, in the present case that the control element need not be proven since Munson does not premise her unsuitability claim on fraud by conduct.[9] In essence, Munson "must show [Boettcher] purchased the securities with an intent to defraud or with reckless disregard for the investor's interests." *Id.* at 899. Such in-

---

od of time, and a pattern of similarly unsuitable investment solicitations."

**8.** New York Stock Exchange Rule 405 provides:
Every member organization is required through a general partner, a principal executive officer or a person or persons designated . . . to
(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization. . . .
(2) Supervise diligently all accounts handled by registered representatives of the organization.
New York Stock Exchange, *Constitution and Rules* ¶ 2405, at 3696 (Apr. 1, 1991).
Section 2152 of the NASD Manual provides:
Sec. 2. (a) In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.
(b) Prior to the execution of a transaction recommended to a non-institutional customer, . . . a member shall make reasonable efforts to obtain information concerning:
(i) the customer's financial status;

(ii) the customer's tax status;
(iii) the customer's investment objectives; and
(iv) such other information used or considered to be reasonable and by such member or registered representative in making recommendations to the customer.
National Association of Securities Dealers, Inc., *NASD Manual (CCH)*, art. III, sec. 2, ¶ 2152, at 2041 (1992).

**9.** The *O'Connor* court distinguished fraud by conduct from fraud premised upon an omission or misrepresentation. *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 (10th Cir.1992). In *O'Connor*, a broker purchased stocks without informing the plaintiff that the stocks were not suited to her investment needs. *Id.* The present case is similar to *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 600 (2d Cir.1978), wherein the defendant recommended to the plaintiff that she purchase certain debentures that the defendant knew or reasonably believed were not suited to her investment needs. *Id.* The *Clark* court did not find that the element of control over an investor's account was a prerequisite to establishing liability in that case.

tent or reckless disregard may be established by demonstrating that Boettcher engaged in a course of business wherein Boettcher regularly recommended investments not suited to its clients' needs. Thus, testimony from other clients may be relevant to prove that Boettcher engaged in a course of business that operated to defraud Munson. *See* § 11–51–123; *see also* 17 C.F.R. § 240.10b–5 (1992). We next review the standard of admissibility of other acts evidence to evaluate the district court's evidentiary ruling in the present case.

### B.

### *Other Acts Evidence*

The admissibility of other acts evidence is governed by CRE 404(b). Titled "Other crimes, wrongs, or acts," CRE 404(b) provides:

> · Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990), we announced a four-part analysis that controls admissibility of other acts evidence proffered pursuant to CRE 404(b). We noted in *Spoto* that all relevant evidence is admissible under CRE 402, but may be excluded under CRE 403, which provides that "evidence may be excluded ... if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 1318 (quoting CRE 403). Like CRE 403, CRE 404(b) limits the admissibility of otherwise relevant evidence.[10] *Id.* While addressing the admissibility of evidence of a prior act, we stated in *Spoto:*

Read together, these rules [of Evidence] require a four-part analysis to determine whether evidence of prior acts is admissible. First, we must ask whether the proffered evidence relates to a material fact, i.e., a fact "that is of consequence to the determination of the action." CRE 401; [*People v.*] *Carlson,* 712 P.2d [1018,] 1021 [Colo.1986]. If it does, we proceed to the second question: is the evidence logically relevant, i.e., does it have "any tendency to make the existence of [the material fact] more probable or less probable than it would be without the evidence?" CRE 401; *Carlson,* 712 P.2d at 1021. If the evidence is logically relevant, we then must determine whether the logical relevance is independent of the intermediate inference, prohibited by CRE 404(b), that the defendant has a bad character, which would then be employed to suggest the probability that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character. *See* CRE 404(b); Imwinkelreid § 2.18. Finally, if the proffered evidence survives the first three parts of the analysis, we must assess whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. CRE 403; *Carlson,* 712 P.2d at 1022.

*Id.*

In evaluating the propriety of trial court rulings on the admissibility of evidence, we have held that "[t]he determination of whether proffered evidence is relevant is within the sound discretion of the trial court." *People v. Lowe,* 660 P.2d 1261, 1264 (Colo.1983) (discussing the admissibility of evidence under CRE 401 and 403); *see People v. Czemerynski,* 786 P.2d 1100, 1108 (Colo.1990) (quoting *People v. Bynum,* 192 Colo. 60, 62, 556 P.2d 469, 471 (1976)) ("It is within the 'special province

---

**10.** Boettcher contends that admitting evidence of its recommendations to other customers would have necessitated mini-trials, wasted time, caused undue delay, and confused 'the jury. CRE 403 permits trial judges to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Boettcher's concerns may properly be presented to the district court who may determine whether Munson's proffered testimony is admissible under both CRE 403 and the law governing fraud premised on unsuitability claims.

and competence of the trial court to determine the relevancy of evidence at trial.' "). We will not disturb the district court ruling absent an abuse of discretion. *Id.* at 1109; *Lowe,* 660 P.2d at 1264. An abuse of discretion will be found only when a trial court ruling is manifestly arbitrary or unreasonable. *Czemerynski,* 786 P.2d at 1108; *People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987).

### C.

### *The District Court Ruling*

In the present case, Munson made an offer of proof that she would present the testimony of Mr. Thomas, Ms. Longacre, and Mr. Eames, regarding "the suitability of the pattern and practice of Mr. Carson recommending ... limited partnership investments despite [their] safe objectives." Munson also contended that the testimony of the three witnesses would prove that there was no supervision by Boettcher to protect the specific investors.

Munson informed the district court that Thomas was a pharmacist who wanted to invest $60,000 with the goal of preserving principal but having some growth over a ten-year period so he could retire on a small amount of income. Longacre, according to Munson, inherited a portfolio of various stocks and sought to invest the funds to both preserve capital and avoid risks. Eames was both a publisher and a trustee who sought to safely invest trust funds.

Boettcher objected to Munson's offer of proof on the grounds that Boettcher's activities with these three witnesses would necessitate time-consuming trials within the Munson trial, and that there was no claim premised on suitability in the present case.

The district court found that the evidence would be offered under CRE 404 in order to prove a common practice, behavior, and design. The district court characterized Munson's claims as involving

negligence, and that ... Carson[ ] behaved in a manner in advising or placing

the plaintiffs into the investment therein in a manner which [was] below the standard for a reasonably competent financial advisor to make that advice, or that he breached a fiduciary duty in failing to advise the plaintiffs to change the investment as he probably should have done, or that Boettcher was negligent in supervision.

The district court concluded that, for the purposes of these claims, evidence of

a common scheme and practice or design is not material, because the issue[s] there [are] not enhanced ... nor is the finder of fact in any way assisted in determining whether those requirements were breached in this case by the existence or non-existence of other cases in which the advice of the defendant might be questioned.

The district court subsequently found that four instances of prior investment counseling, taken from a client pool of approximately 200, would not "allow a finder of fact to infer that there was a common practice, behavior, or design for the purpose of attempting to show willful or wanton or fraudulent conduct." The district court ruled that the witnesses' testimony would be excluded because it "would be far more prejudicial to the defendant than it would [be of] assistance [to] the finder of fact."

█ By so ruling, the district court did not properly consider the offer of proof in the framework of a securities fraud case, premised on a theory of unsuitability, under section 11–51–123. The district court, for example, failed to consider whether evidence of Boettcher's course of business was probative of Boettcher's intent to defraud Munson in the present case. Because the district court did not properly employ the applicable standards, based on the foregoing analysis, the decision of the court of appeals is affirmed, and this case is returned to the court of appeals with directions to remand the case to the trial court for further proceedings consistent with this opinion.[11]

---

**11.** We accordingly do not affirm the court of appeals conclusion that "the trial court erred in

ROVIRA, C.J., concurs in the result only.

MULLARKEY and SCOTT, JJ., do not participate.

Chief Justice ROVIRA concurring in the result only:

The majority concludes that the court of appeals correctly determined that the trial court erred in refusing to instruct the jury that it should not consider any tax consequences in determining the amount of damages suffered by Margaret Munson and the William R. Munson Trust ("plaintiffs"). I disagree. For the reasons set forth in part III of the majority opinion, I agree that a remand for a new trial is warranted. Accordingly, I concur in the result only.

I

Plaintiffs sued Boettcher & Company, Inc., and Craig L. Carson (referred to collectively as "Boettcher"), seeking damages based on several claims for relief. Those claims included actions for fraud, negligence, breach of fiduciary duty, and violation of Colorado securities regulations. The trial court granted Boettcher's motion for summary judgment concerning the fraud claim, and a jury rejected all but one of plaintiffs' remaining claims for relief. The jury found that Boettcher had breached its fiduciary duty owed to plaintiffs and determined that plaintiffs were entitled to receive $39,550 in damages.

At trial, numerous objections and motions were made concerning testimony regarding the impact of taxes on damages. That testimony, in pertinent part, was as follows.

First, plaintiffs called John T. Christensen who was qualified as an expert in the areas of financial advice and securities sales, supervision, and regulation. Chris-

tensen testified regarding the characteristics of a "more conservative" investment portfolio and compared those characteristics to the portfolio designed by Boettcher and invested in by plaintiffs (hereinafter "the Boettcher portfolio"). Specifically, Christensen opined that the portfolio recommended by Boettcher was improperly suited to plaintiffs' expressed desire to create a tax shelter through secure investments. Christensen also testified, over defense objection, that in light of plaintiffs' investment goals, the portfolio recommended by Boettcher constituted a breach of Boettcher's fiduciary duty.

Plaintiffs later called Robert F. Kutchera who was qualified as an expert in the areas of accounting and tax planning. Kutchera testified regarding the merits of the investment strategy recommended by Boettcher and its relation to tax planning. In reaching the conclusion that the Boettcher portfolio did not create an effective tax shelter, Kutchera testified as to the tax benefits plaintiffs enjoyed as a result of these investments.[1] Kutchera also testified regarding the damages allegedly suffered by plaintiffs as a result of investing in the Boettcher portfolio. He calculated the damages by taking the benefits plaintiffs received from the Boettcher portfolio and subtracting that amount from the benefits plaintiffs would have received had they invested in the hypothetical, conservative portfolio presented by Christensen.[2]

Defendant then called Wiley Hairgrove who was certified as an expert in accounting. The gravamen of Hairgrove's testimony concerned the tax consequences of investing in the hypothetical portfolio developed by Christensen and the return derived therefrom as calculated by Kutchera. Hairgrove testified that the income generated by investment in the hypothetical port-

not allowing the plaintiffs to present the similar transaction evidence." *Munson v. Boettcher & Co.*, 832 P.2d 967, 971 (Colo.App.1991). We rather find that the district court must make a determination upon application of the proper standards.

1. Kutchera testified that "in my opinion that's how much she actually has saved just because of being in these limited partnerships for this peri-

od of 10 years, $51,000. The income tax savings only. It has nothing to do with cash distributions or sales price, or anything else, that's just the tax consequence, the tax benefit, I should say."

2. Kutchera testified the amount of damages suffered by plaintiffs "as a result of participating in the Boettcher portfolio as opposed to Mr. Christensen's portfolio" was $558,300.

folio would have created a net tax liability of approximately $120,000. Hairgrove testified further that if this tax liability were considered on an annual basis to determine the after-tax return on the hypothetical investment (i.e., the amount of after-tax interest which would be reinvested so as to earn interest in subsequent years), the aggregate return on that investment would have been $333,100, or $225,200 less than what Kutchera testified to. In short, Hairgrove testified that the return on the hypothetical investment would be significantly less than what Kutchera testified to, if one considers the taxes due on the interest generated by the principal investment, because the amount of money used to determine plaintiffs' interest income earned the next year, and in subsequent years, would be less.

Thus, testimony was presented at trial which concerned the effects of taxation in two entirely distinct forms. First, the testimony of plaintiffs' witness, Kutchera, raised the issue of whether the tax benefits enjoyed by plaintiffs as a result of their investment in the Boettcher portfolio should be considered in determining the amount of damages which plaintiffs might be entitled to. Hairgrove's testimony focused on whether the tax liability which would have been incurred had plaintiffs invested in the hypothetical portfolio should be considered by the jury in calculating the amount of damages suffered by plaintiffs, if any. In short, Kutchera testified as to the effect of tax benefits on a damage award, and Hairgrove testified as to why and how taxes should be considered in calculating plaintiffs' damages based on their lost profits.

After the jury returned its verdict, plaintiffs appealed, arguing, among other things, that the trial court erred in refusing to instruct the jury concerning the issue of taxation as it relates to damage awards.

## II

The plaintiffs tendered Jury Instruction 1, which provided:

In determining the amount of any damage award to plaintiffs, taxation should not be a factor in your determination; therefore, you are not to include or subtract any amount because of taxes paid or to be paid.

The trial court denied the instruction, finding "that taxation certainly is an issue and must be considered by the jury in determining whether or not the plaintiffs were damaged, ... and what impact the tax deferral benefits may have benefitted or not benefitted [plaintiffs] in determining damages." The court then concluded that because it was "basically outside of the judge's skill to determine an instruction on damages explaining that rather refined concept, and the Court does not find plaintiffs' Tendered Instruction Number 1 to [do so,] the Court has determined that it would not give an instruction on taxes."

Accordingly, the court of appeals addressed the question of whether "the trial court erred in refusing to instruct the jury that it should not consider any tax consequences in determining damages." *Munson v. Boettcher & Co., Inc.*, 832 P.2d 967, 969 (Colo.App.1991). The court of appeals first held "that the tax benefits received as a result of the limited partnership investments should not have been considered as an offset to the award of damages," *id.*, and concluded that "the trial court erred in refusing to instruct the jury to disregard the tax benefits received by the plaintiffs in determining the award of damages." *Id.* at 970. Boettcher did not request review of this ruling.

The court of appeals also held, however, that "in calculating the damage award based on a hypothetical investment portfolio, the award of damages should not be reduced by the taxes which might have been owed on gains from investments in that portfolio." *Id.* Consequently, the court of appeals also held that the trial court erred in refusing plaintiffs' tendered Jury Instruction 1 on this issue.

## III

Boettcher appealed this second ruling, and it is only in this respect that we are called upon to determine the question of whether a limiting instruction is required

when testimony concerning the relationship between taxation and damages is admitted.

In my opinion, the court of appeals erred in reaching the conclusion that Jury Instruction 1 should have been given so as to properly inform the jury on how to consider the testimony concerning the taxes which would have been due had plaintiffs invested in the hypothetical portfolio. The basis for this conclusion is the fact that tendered Jury Instruction 1, by its own terms, has no bearing on the question of taxes as they relate to the hypothetical portfolio. As noted above, that instruction mandated only that the jury was "not to include or subtract any amount because of *taxes paid or to be paid.*" Clearly, the hypothetical taxes which would have had to have been paid by plaintiffs if they invested in the hypothetical portfolio are neither "taxes paid," nor taxes that are "to be paid." Rather, they represent only the tax liability that would have been created had the plaintiffs invested in the hypothetical portfolio. As such, Jury Instruction 1 would not have informed the jury, one way or another, regarding whether to accept Hairgrove's calculation of damages based on the hypothetical portfolio (which took into account the tax liability that would have been created by investing in that portfolio) or Kutchera's calculation (which did not). Consequently, it is my opinion that the trial court did not err in refusing to give Jury Instruction 1 insofar as Hairgrove's testimony was concerned, because that instruction has nothing to do with that testimony.

The conclusion that Jury Instruction 1 has no bearing on Hairgrove's testimony is strengthened by considering the sources that plaintiffs have relied on in support of this instruction. Three cases are cited by plaintiffs as authority for the substance of Jury Instruction 1. All of those cases are irrelevant to the legal question presented by Hairgrove's testimony.

For example, *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), involved a defrauded tax shelter investor who was allegedly entitled to some measure of damages under the securities laws. The Supreme Court addressed the question of whether the tax benefits realized by an investor should be offset against his recovery of rescissionary damages under 15 U.S.C. § 77*l* (2), a section of the 1933 Securities Act, which allows a defrauded investor to recover what he paid for the security, with interest, "less the amount of any income received thereon...."

The Court held that the tax benefits received by the defrauded investor as a result of his investment in the tax shelter did not constitute "income received" on the tax shelter investment. Speaking for the Court, Justice O'Connor stated that "the 'receipt' of tax deductions or credits is not itself a taxable event for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code." *Loftsgaarden,* 478 U.S. at 657, 106 S.Ct. at 3149.

*Loftsgaarden* then, is directly on point with respect to the alleged error committed by the trial court in refusing Jury Instruction 1 as that instruction relates to the testimony of Kutchera concerning the tax benefits plaintiffs' received by their investment in the Boettcher portfolio, *i.e.,* one of the issues resolved by the court of appeals, but not appealed by either party. The case has no bearing, however, on the testimony presented by Hairgrove with respect to the hypothetical taxes on the hypothetical portfolio.

Plaintiffs also relied on *Western Federal Corp. v. Erickson,* 739 F.2d 1439 (9th Cir. 1984), in support of Jury Instruction 1. *Erickson* addressed the same issue that the Supreme Court considered in *Loftsgaarden* two years after the Ninth Circuit rendered its opinion. The *Erickson* court stated, in relevant part, "[o]ur recent decision in *Burgess v. Premier Corp.,* 727 F.2d 826, 837–38 (9th Cir.1984), refused to deduct tax benefits in a securities case, and specifically endorsed the reasoning of the district court in this case [holding that the judgment should not be reduced by the amount of tax benefits realized by the investors]. The appellants' argument is without merit." *Erickson,* 739 F.2d at 1444. Like *Loftsgaarden, Erickson* also

provides support for the conclusion that Jury Instruction 1 has no relevancy to the taxation issue presented by Hairgrove's testimony.

Finally, plaintiffs cite *Knuckles v. C.I.R.*, 349 F.2d 610 (10th Cir.1965), in support of Jury Instruction 1. *Knuckles* has absolutely no bearing on *any* issue presented in this case, as the sole question presented there was "whether the amount of money received by taxpayer, Mason K. Knuckles, in settlement of a claim against his former employer was money received as damages for personal injuries and hence not includable in income under section 104(a) of the Internal Revenue Code (26 U.S.C.A. § 104(a))." *Id.* at 612.

In sum, by its very terms Jury Instruction 1 is simply not pertinent to the question of whether hypothetical taxes which would be owed on a hypothetical investment used to calculate lost profits may be considered by the jury. The fact that the authority relied on by plaintiffs for this instruction has nothing to do with the issue presented to this court, provides additional support for my opinion that Jury Instruction 1 itself has no relevance to that issue.

### IV

The majority correctly observes that this court has "not previously considered whether evidence of income tax liability is relevant to a damage award in an action premised on both Colorado securities laws and common law." Maj. op. at 203. I also agree with the majority's statement that "federal authorities are highly persuasive when the Colorado Securities Act parallels federal enactments." *Id.* at 204.

I believe, however, that the precedent relied on which is derived from federal securities law cannot support the holding that a jury should not consider the hypothetical tax liability on a hypothetical investment portfolio which was introduced for the purpose of establishing the plaintiffs' damages. The reason for this conclusion is that under the federal securities laws relied on by the majority, lost profits—the measure of damages which the hypothetical portfolio is intended to illustrate—are simply not an appropriate measure of damages.[3] To the contrary, the case law applying section 12 of the Securities Act of 1933 (the same section which the majority relies on in support of its holding) provides that the appropriate measure of damages under that section is rescission and restitution if the investor still owns the property, or a rescissionary measure of damages otherwise. Indeed, the majority opinion implicitly acknowledges this fact when it cites *Burgess v. Premier Corp.*, 727 F.2d 826 (9th Cir.1984), for the proposition that "[t]he purpose of the damages [under the securities act of 1933] is to place the doctors in as good a position financially as that in which they would have been had they not made the transaction, *i.e.*, to accomplish rescission." Maj. op. at 204 (quoting *Burgess*, 727 F.2d at 838). While the authorities which are in accord with *Burgess* are too numerous to cite, representative cases include *Astor Chauffeured Limousine v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1551–52 (7th Cir.1990) ([T]he securities "statutes limit victims to 'actual damages', which courts routinely understand to mean 'out of pocket loss'.... [which] does not include lost profits." (citations omitted)); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 203, n. 25 (3d Cir.1990) ("A defrauded buyer is entitled to rescission under section 12(2), if the defendant seller still owns the stock, or a rescissionary measure of damages otherwise."); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 372–73 (4th Cir.1986) (rescission and restitution are

---

**3.** I am aware, however, that lost profits may be an appropriate measure of damages under one of plaintiffs' other theories of recovery. Consequently, if plaintiffs assert the same claims for relief at the new trial as they have here, and can show that lost profits are a proper measure of damages under one or more of those claims, it should be made clear that liability premised on only certain claims for relief can warrant the imposition of damages based on lost profits. That is, if the jury were to find that Boettcher is liable based solely on Colorado securities law, then lost profits should not be considered in measuring the damages suffered by plaintiffs as a result of the violation of those laws.

the proper measure of damages under section 12(2)). *See Randall v. Loftsgaarden*, 478 U.S. 647, 671–72, 106 S.Ct. 3143, 3157 (Brennan, J., dissenting) ("rescission and restitution ... is the relief Congress describes in § 12(2)," and observing that placing a plaintiff "in a better position than he occupied before the contract was made [is] a result contrary to the theory of restitution").

Consequently, the reliance on authority addressing the question of whether taxes are a proper consideration in the context of a securities damage award are, to say the least, applied out of context in determining whether taxes are a proper consideration in determining lost profits suffered as a result of a securities transaction. It is my opinion therefore, that such authority should not, and cannot properly, be relied on.

Furthermore, even if one were to assume that this authority "provides the appropriate framework," maj. op. at 206, the factual context of those decisions is so clearly distinguishable from the circumstances presented here, that the conclusions reached are simply inapposite to the present controversy. As previously noted, *Loftsgaarden* addressed the question of whether the tax benefits received by a tax shelter investor were to be considered "income received" for purposes of determining damages under the Securities Act of 1933. The hypothetical tax liability which would have been incurred had plaintiffs invested in the hypothetical portfolio is obviously not a "tax benefit" and thus, no argument could conceivably be made that such taxes—which have never and will never be paid by plaintiffs—should be characterized as "income received." Because the hypothetical taxes at issue here can neither be characterized as a "tax benefit" nor "income received," the issue which the Court addressed in *Loftsgaarden* is irrelevant to the question presented here.

V

Though there is apparently no authority on point regarding whether a jury should consider the hypothetical tax liability creat-

ed on a hypothetical investment which is testified to in order to assess lost profits, I am of the opinion that such taxes should be considered. As Hairgrove's testimony clearly illustrates, the only way in which to accurately estimate the return generated by a hypothetical investment is to consider the tax liability that such an investment would create. The reason this is the case is that in the absence of tax considerations, the return which is reinvested year after year will be significantly greater than it would be in the "real world," that is, if plaintiffs actually had invested in the hypothetical portfolio. The greater returns that are generated by virtue of ignoring the applicable tax liability will in turn generate a greater return in subsequent years (as more and more money will be reinvested year after year than if the applicable tax liability were considered). As Hairgrove explained, the difference between plaintiffs' lost profits based on the tax-free hypothetical portfolio as compared to a hypothetical portfolio in which only the after tax amounts are reinvested is $225,200.

While the law does not require a jury to assess damages with mathematical certainty, a jury should be provided "[a] reasonable basis for computation and the best evidence obtainable under the circumstances of the case which will enable [it] to arrive at a fairly approximate estimate of the loss." *Tull v. Gundersons, Inc.*, 709 P.2d 940, 945–46 (Colo.1985) (citation omitted). Permitting a jury to consider the tax liability created by the investment in a hypothetical portfolio which is admitted as proof of lost profits would, in my opinion, provide "the best evidence obtainable" to arrive at a "fairly approximate estimate of the loss." *Id.*

For the reasons stated above, I respectfully disagree with part II of the majority opinion and accordingly, concur in the result only.