24CA0569 Peo in Interest of VF-MA 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0569
City and County of Denver Juvenile Court No. 22JV30583
Honorable Michael Spear, Judge

The People of the State of Colorado,

Appellee,

In the Interest of V.F-M.A., a Child,

and Concerning J.R.A. and A.M.P.,

Appellants.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE NAVARRO
Dunn and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Kerry Tipper, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant J.R.A.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant A.M.P.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    J.R.A. (father) and A.M.P. (mother) appeal the judgment terminating their parent-child legal relationships with their child, V.F-M.A.  We affirm.

## I.    Background

¶ 2    In September 2022, the Denver Department of Human Services filed a petition in dependency and neglect after the child tested positive for controlled substances at birth.  The Department alleged that the parents had an ongoing dependency and neglect case and father was incarcerated in the Department of Corrections (DOC).  The Department placed the child with R.E. and N.E. (placement providers).  The Department considered the placement providers a kinship placement because mother's cousin was R.E.'s adopted brother's birth mother.

¶ 3    The parents ultimately admitted the petition's allegations, and the juvenile court adjudicated the child dependent and neglected.  The court then adopted treatment plans for the parents that required them to (1) address their substance abuse issues; (2) provide the child with a safe and stable home; (3) meet the child's needs; and (4) cooperate with the Department and treatment providers.  Father's treatment plan also required him to abstain

from further criminal activity and comply with the provisions of his parole. Almost a year later, the Department moved to terminate the parents' parental rights.

¶ 4 The juvenile court set an evidentiary hearing for March 2024. Before the hearing, the court granted requests from the placement providers and Ja.P and Jo.P. (maternal relatives) to intervene in the case. At the hearing, the court heard testimony from several witnesses, including a caseworker from the parents' previous case who was also the caseworker at the beginning of this case (first caseworker), as well as the current caseworker (second caseworker). The parents asserted, among other things, that the Department improperly placed the child with the placement providers, who were not kin, instead of properly investigating relatives, including maternal relatives or paternal grandmother (who had custody of the parents' older child via an allocation of parental responsibilities (APR) in the previous case). After hearing the evidence, the court rejected the parents' arguments and terminated their parental rights.

## II.  Motion to Intervene

¶ 5    Father asserts that the juvenile court erred by granting the placement providers' motion to intervene.  We disagree.

### A.  Standard of Review and Principles of Statutory Interpretation

¶ 6    A juvenile court's decision to grant or deny a motion to intervene as a matter of right is a question of law that we review de novo.  *Feigin v. Alexa Grp., Ltd.*, 19 P.3d 23, 28 (Colo. 2001).  Statutory interpretation also presents questions of law that we review de novo.  *People in Interest of C.L.S.*, 313 P.3d 662, 665-66 (Colo. App. 2011).

¶ 7    We must liberally construe provisions of the Colorado Children's Code to serve the welfare of children and the best interests of society, *People in Interest of S.X.M.*, 271 P.3d 1124, 1130 (Colo. App. 2011), and to avoid "any technical reading" that "would disregard [a child's] best interests," *C.S. v. People in Interest of I.S.*, 83 P.3d 627, 635 (Colo. 2004).  We favor interpretations that produce a harmonious reading of the statutory scheme, *People in Interest of J.G.*, 2016 CO 39, ¶ 13, and we presume that the General Assembly intended a just and reasonable result by avoiding an

interpretation that would lead to an absurdity, *People in Interest of H.*, 74 P.3d 494, 495 (Colo. App. 2003).

¶ 8    In construing statutes, appellate courts must ascertain and give effect to the General Assembly's intent by implementing the plain and ordinary meanings of the General Assembly's words. *J.G.*, ¶ 13; *People in Interest of B.C.B.*, 2024 COA 88, ¶ 15.  To discern the plain and ordinary meanings of words not defined by statute, we may consider dictionary definitions.  *See People v. Grosko*, 2021 COA 28, ¶ 18.  If the language in a statute is clear and unambiguous, we apply it as written.  *See State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000).

B.    Preservation

¶ 9    As a preliminary matter, the Department and guardian ad litem (GAL) assert that father did not adequately preserve this issue for appeal because he did not raise it until his closing argument. We disagree.

¶ 10    Because dependency and neglect cases are civil in nature, appellate courts will not address issues that were not raised and resolved in the juvenile court.  *See People in Interest of M.B.*, 2020 COA 13, ¶ 14.  An issue is properly preserved if the court had "an

4

adequate opportunity to make findings of fact and legal conclusions" on the precise issue raised on appeal. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18.

¶ 11 Shortly before the termination hearing, the placement providers moved to intervene under section 19-3-507(5)(a), C.R.S. 2024, asserting that they could intervene as a matter of right because they were a "kinship placement" and had had the child in their care for about seventeen months. On the first day of the hearing, mother objected to the placement providers' motion to intervene because she did not "recognize [them] as kin to her." Counsel for the placement providers then argued that, even if the juvenile court determined that they were not kin, they could intervene as foster parents under section 19-3-507(5)(d) because the child had "been with them over 12 months." The court granted the placement providers' motion "under the grounds as stated by their counsel."

¶ 12 To be sure, father did not object to the motion to intervene before the termination hearing. In closing argument, however, father's counsel asserted that, because the placement providers could not be considered kin or foster parents based on the

definitions in section 19-1-103, C.R.S. 2024, the juvenile court had improperly allowed them to intervene and therefore denied him a fundamentally fair proceeding.  In its written order, the court found that the placement providers were kin based on the "definition of kin provided in [section] 19-1-103(91)" and "the testimony regarding the [Department's] decision to place the child with" the placement providers.

¶ 13     On appeal, father asserts that the juvenile court erred because the placement providers were neither kin nor foster parents and therefore could not intervene under section 19-3-507(5).  His appellate argument tracks his closing argument at the hearing, and the court addressed that argument in its written order.  Therefore, we agree with father that he preserved this issue for appeal.

¶ 14     Finally, we are not otherwise convinced by the Department and GAL's assertion that father needed to raise the issue before the closing argument to preserve it because (1) they do not provide any legal authority in support of this position and (2) the juvenile court ruled on the issue before the hearing, based on the placement providers' argument and mother's objection.  *See People v. Cooley*, 2020 COA 101, ¶ 23 (Although a defendant "could have — and

perhaps should have — raised" an issue earlier, "[b]ecause the issue was raised when the district court had an opportunity to decide the issue, [the defendant] preserved it for appellate review.").

### C. Analysis

¶ 15     Section 19-3-507(5) allows certain parties to intervene as a matter of right in a dependency and case following an adjudication. For example, the statute allows a "kin caregiver who has the child in the caregiver's care for more than three months" to intervene. § 19-3-507(5)(a).  Likewise, the statute provides that "[f]oster parents who have the child . . . in their care for twelve months or more may intervene." § 19-3-507(5)(d).

¶ 16     As relevant here, the Colorado Children's Code defines "kin" as including "a person ascribed by the family as having a family-like relationship with the child." § 19-1-103(91).  In the present case, R.E. testified that she was "very close" with mother's cousin, "consider[ed] them family," referred to mother's cousin as "Momma," and "spen[t] holidays together."  She further testified that mother's family reached out to her to see if she could be a placement for the child and mother's cousin gave the Department her information.  Therefore, the record shows that the placement

7

providers were ascribed by mother's family (e.g., mother's cousin) as having a family-like relationship with the child.

¶ 17    Father asserts that the placement providers could not have a family-like relationship *with the child* because they had never met the child before they became her caregivers.  But such a technical reading of the statute would prevent a nonrelative from ever qualifying as kin to a newborn child.  Considering that the legislature intended to expand the traditional understanding of kin, we are not convinced that the legislature intended to limit the application of the definition in this way.  *Cf.* Black's Law Dictionary 1039 (12th ed. 2024) (defining "kin" as "[a] relative by blood, marriage, or adoption, though usu. by blood only").  Rather, we conclude that the legislature intended that a person who has a family-like relationship with a child's family necessarily has a family-like relationship with the child.

¶ 18    Father also contends that the definition should not apply because the placement providers were never ascribed by the family — i.e., mother and father — given that neither he nor mother had any relationship with the placement providers.  In support, father cites a dictionary definition for "family," which defines the term as

8

"the basic unit in society traditionally consisting of two parents rearing their children." Merriam-Webster Dictionary, https://perma.cc/TQN4-X9B7. We are not convinced that the legislature intended to limit kin to only people who have a family-like relationship with the parents; rather, we conclude that, when the legislature used the term "family" in this definition, it intended to refer to the broader meaning of family. *See id.* (providing an alternate definition of family that includes "a group of persons of common ancestry"); *see also* Black's Law Dictionary at 744 (defining family as "persons connected by blood, by affinity, or by law, esp. within two or three generations"). We therefore reject father's argument.

¶ 19 Because we have concluded that the placement providers qualified as kin under the definition discussed above, we need not consider whether they could also be considered kin under the other definitions in section 19-1-103(91). Likewise, we need not consider whether the placement providers met the definition of "foster parent" so as to permit intervention under section 19-3-507(5)(d).

¶ 20 In sum, because the placement providers were ascribed by the family as having a family-like relationship with the child, they met

the definition of kin and could intervene in the case under section 19-3-507(5)(a). As a result, the juvenile court did not err in granting the placement providers' motion to intervene and allowing them to participate in the case. Finally, because the court properly granted the motion to intervene, father's assertion that the placement providers' participation in the case rendered the proceeding fundamentally unfair necessarily fails.

¶ 21    At any rate, even if the juvenile court erred, we discern no basis to reverse the judgment because father has not shown any prejudice resulting from the putative error. *See* C.A.R. 35(c) (An "appellate court may disregard any error or defect not affecting the substantial rights of the parties."); *People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007) (a parent may not obtain relief on a procedural due process claim absent a showing of harm or prejudice); *see also Moody v. Corsentino*, 843 P.2d 1355, 1375 (Colo. 1993) (the party asserting the error has the burden to establish that "the error had a prejudicial effect").

¶ 22    At the termination hearing, the placement providers were represented by counsel, who cross-examined witnesses and made a closing argument. But the placement providers did not call any

independent witnesses or introduce any documentary evidence. And although the placement providers testified, they were called as witnesses by the GAL. Father has not directed us to any specific evidence presented by the placement providers that would not have been before the juvenile court had it denied their motion to intervene. Indeed, father argues that the placement providers' participation resulted in nothing more than a "needless cumulation of evidence and argument." In other words, father effectively agrees that their participation added nothing significant to the case. *See Johnson v. Nat'l R.R. Passenger Corp.*, 989 P.2d 245, 250 (Colo. App. 1999) ("The admission of cumulative evidence, in and of itself, is not reversible error.").

## III. Criminal History

¶ 23 Father next contends that the juvenile court erred by admitting evidence of his criminal history without considering whether the evidence was admissible under CRE 404(b) and *People v. Spoto,* 795 P.2d 1314 (Colo. 1990). We conclude that father did not preserve this claim for our review.

## A.   Relevant Law

¶ 24     Evidence of other crimes, wrongs, or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  CRE 404(b)(1).  But Rule 404(b)(2) allows a court to admit the other acts evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

¶ 25     Generally, when a party presents evidence of other acts under Rule 404(b), the trial court should apply the four-part test developed in *Spoto*, 795 P.2d at 1318.  The *Spoto* test provides that such evidence is admissible only if (1) the evidence relates to a material fact; (2) the evidence has logical relevance; (3) the logical relevance of the evidence does not depend on an intermediate inference that the party has a bad character; and (4) the probative value of the evidence is not substantially outweighed by the evidence's unfairly prejudicial impact.  *Id.*

¶ 26     Rule 404(b) and the *Spoto* test typically arise in criminal cases.  While Colorado courts have sporadically applied the *Spoto* test in civil cases, *see, e.g.*, *Boettcher & Co. v. Munson*, 854 P.2d 199, 210

12

(Colo. 1993), a division of this court had rejected the application of Rule 404(b) and *Spoto* in the context of a dependency and neglect case, *see People in Interest of A.W.*, 2015 COA 144M, ¶¶ 19-23 (concluding that CRE 404(b) and *Spoto* did not apply to evidence of a parent's treatment of her other children when offered to establish "prospective harm" at the adjudicatory stage of the case).

## B. Preservation

¶ 27 We agree with the Department and the GAL that father failed to preserve this issue because he did not ask the juvenile court to apply Rule 404(b) and *Spoto* to the evidence at issue.

¶ 28 At the close of its case-in-chief, the Department asked the juvenile court to admit father's criminal history records produced by the Colorado Bureau of Investigation and the Denver Police Department. Father objected because the Department did not endorse a witness who "could appropriately enter these exhibits into evidence." Father further stated that, if the court was still inclined to admit the exhibits, then he objected to "anything that occurred prior to the dispositional hearing as the criminal matters were not a part of his treatment plan until that point so anything before would be irrelevant or improper character evidence." The

court admitted the exhibits, but it did not specifically address their relevance or whether anything in them constituted improper character evidence.

¶ 29      We conclude that father's fleeting reference to "improper character evidence" did not sufficiently alert the juvenile court that he was objecting under Rule 404(b) and asking the court to apply the *Spoto* test.  This is especially true given that father points to no decision holding that Rule 404(b) and *Spoto* apply in the dependency and neglect context.  On the contrary, the only appellate decision to consider the issue rejected the application of Rule 404(b) and *Spoto* to this context.  *See A.W.*, ¶¶ 19-23.  So we cannot conclude that the juvenile court was put on notice of a request to apply Rule 404(b) and *Spoto*.

¶ 30      For the same reason, we conclude that father did not sufficiently bring the analysis of *Rojas v. People*, 2022 CO 8, to the juvenile court's attention.  In *Rojas*, the supreme court abolished the res gestae doctrine in criminal cases and replaced it with "an intrinsic-extrinsic distinction," in which (1) extrinsic acts fall under Rule 404(b) and (2) intrinsic acts fall outside the rule's scope.  *Id.* at ¶¶ 4, 44.  Intrinsic acts are those that directly prove the charged

crime or that occurred contemporaneously with the charged crime and facilitated its commission. *Id.* at ¶ 52. But nothing in father's objection referenced this "intrinsic-extrinsic distinction" or explained how it could apply outside of a criminal case.

¶ 31 In sum, because father did not adequately present to the juvenile court his new arguments based on Rule 404(b), *Spoto*, and *Rojas*, we will not consider those arguments. *See M.B.*, ¶ 14.

## IV. Fitness

¶ 32 Father argues that the juvenile court erred by finding that he was unfit based solely on his incarceration. Mother asserts that, because the record shows that she was fit (or alternatively, could become fit within a reasonable time), the court erred by terminating her parental rights. We disagree with these contentions.

### A. Applicable Law and Standard of Review

¶ 33 As relevant here, before the juvenile court terminates parental rights under section 19-3-604(1)(c), it must find, by clear and convincing evidence, that (1) the parent is unfit and (2) the parent's conduct or condition is unlikely to change in a reasonable time.

¶ 34 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care.

15

*People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007).
Reasonable parental care requires, at a minimum, that the parent
provide nurturing and safe parenting sufficient to meet the child's
physical, emotional, and mental needs and conditions. *People in
Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's
noncompliance with a treatment plan generally "demonstrates a
lack of commitment to meeting the child's needs and, therefore,
may also be considered in determining unfitness." *People in Interest
of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 35 As noted, when determining whether a parent's conduct or
condition is likely to change in a reasonable time, the juvenile court
may consider whether any change has occurred during the
proceeding, the parent's social history, and the chronic or long-term
nature of the parent's conduct or condition. *D.L.C.*, 70 P.3d at
588-89. Where a parent has made little to no progress on a
treatment plan, the court need not give the parent additional time
to comply. *See People in Interest of R.B.S.*, 717 P.2d 1004, 1006
(Colo. App. 1986).

¶ 36 The determination of a reasonable period is fact-specific and
so varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874,

876 (Colo. App. 2007); *see also S.Z.S.*, ¶ 24. A reasonable time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 24. When a child is under six years old, as in this case, the juvenile court must also consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024.

¶ 37 Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, and we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

## B. Father

¶ 38 Father asserts that the juvenile court erred by relying solely on his incarcerated status when it terminated his parental rights. We disagree.

¶ 39 When the juvenile court adopted father's treatment plan in February 2023, he was incarcerated at the Crowley County Correctional Facility, where he remained until April 2023. Father

was then released to a halfway house, but he left in June 2023 and his whereabouts remained unknown until he was arrested on a warrant in November 2023. Father then spent time in the county jail, Denver Reception and Diagnostic Center (DRDC), the Colorado Territorial Prison, and Fremont Correctional Facility (where he remained during the termination hearing). In sum, father was incarcerated in the DOC or county jail for about ten of the seventeen months of the case.

¶ 40    We first consider father's assertion that *K.D. v. People*, 139 P.3d 695 (Colo. 2006) is no longer controlling precedent based on the passage of Senate Bill 23-039 (S.B. 23-039). In *K.D.*, our supreme court determined that a juvenile court may consider parental incarceration as a factor when deciding whether to terminate parental rights. In doing so, the supreme court relied, in part, on one of the fitness factors in section 19-3-604(2) that allowed the juvenile court to consider a parent's incarceration. *K.D.*, 139 P.3d at 701 (considering former section 19-3-604(1)(b)(III), C.R.S. 2005); *see also* § 19-3-604(2)(a) (allowing the court to consider the bases for a finding of parental unfitness in section 19-3-604(1)(b)). Ultimately, the supreme court determined that,

although a court may consider parental incarceration, it could not rely on "[p]arental incarceration alone" as a "basis on which to terminate parental rights." *K.D.*, 139 P.3d at 700.

¶ 41     As father notes, however, the legislature in S.B. 23-039 recently repealed the subsection in 19-3-604(1)(b) on which the supreme court in *K.D.* partially relied. *See* Ch. 191, sec. 7, § 19-3-604, 2023 Colo. Sess. Laws 957 (repealing former section 19-3-604(1)(b)(III)). But we are not convinced that S.B. 23-039 has significantly impacted the holding of *K.D.* because it conforms with S.B. 23-039's legislative declaration, which states, in relevant part, that "decisions to terminate parental rights should be based on the needs of the child, and not *solely* on the status of the parent as incarcerated or the length of the sentence." 2023 Colo. Sess. Laws at 953 (emphasis added). In other words, the General Assembly confirmed that, while a parent's incarceration cannot be the sole reason for termination, it may still be considered as one of the factors in a juvenile court's decision.

¶ 42     Moreover, the supreme court's decision in *K.D.* recognized that a juvenile court can consider a parent's incarceration *outside* of the context of the provision that was recently repealed. *See K.D.*, 139

P.3d at 701 ("The requirement that a court consider section 19-3-604(1)(b)(III) in determining parental fitness under section 19-3-604(2) does not preclude the court from considering periods of incarceration not specified therein.").[1]

¶ 43      Having concluded that a juvenile court may still consider parental incarceration as long as it is not the sole reason for termination, we reject father's contention because nothing in the court's ruling suggests that it relied solely on his incarceration when finding him unfit and terminating his parental rights.

¶ 44      The juvenile court found, with record support, that father did not comply with any component of his treatment plan. *See D.P.*, 181 P.3d at 408. For example, the record shows that, even when father was not incarcerated during the case, he did not consistently visit the child or participate in substance abuse treatment or monitoring. The record also shows that father had new criminal charges, which resulted in his return to prison, in violation of his

---

[1] The supreme court explained that "[w]e see nothing in the Code precluding the trial court from considering even a relatively short period of parental incarceration as a significant factor in determining fitness." *K.D. v. People*, 139 P.3d 695, 701 (Colo. 2006).

treatment plan. With this information, the court determined that father was unfit because he was unable or unwilling to give the child reasonable parental care and could not meet the child's needs.

¶ 45 Therefore, although the record shows that father's incarceration during the case informed the juvenile court's decision, it was not the sole reason that the court found him unfit. *See K.D.*, 139 P.3d at 703 (The court did not err when it "carefully considered how [the parent's] continued incarceration affected his fitness and his corresponding ability to meet [the child's] needs within a reasonable time."). We therefore reject father's assertion.

### C. Mother

¶ 46 Mother asserts that the juvenile court erred by finding that she was unfit and unlikely to become fit in a reasonable time. We disagree.

¶ 47 The juvenile court found that mother had not successfully complied with her treatment plan to become a fit parent. *See D.P.*, 181 P.3d at 408. For example, the court found that mother had continued "using drugs throughout the pendency" of the case and that mother's "recent period of sobriety" was not "sufficient to consider her successful in the substance abuse aspect of her

treatment plan." *See* § 19-3-604(2)(e) (stating that a parent may be unfit based on "[e]xcessive use of . . . controlled substances . . . which affects the ability to care and provide for the child").

¶ 48     The juvenile court also found that mother's conduct or condition was unlikely to change in a reasonable time. The court noted that mother had begun to show "any initiative to meet the plan requirements" only within the previous "180 days" but "even those efforts [were] with great struggle and led to minimal success." *See People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even "increased compliance" over the course of a case may not justify additional time). The court further found that mother was "struggling with substance use disorder" and, "based upon her history over the course of the last three years," it was unlikely that she would "meet her own rehabilitation much less a rehabilitation of her ability to safely and appropriately parent." *See D.L.C.*, 70 P.3d at 588-89.

¶ 49     The record supports the juvenile court's findings. Both the first and second caseworkers testified that mother had reported struggling with substance abuse for many years. The first caseworker testified that one of mother's younger children had

22

tested positive for controlled substances, which led to the filing of the first case, and that mother had a similar treatment plan in that case but did not adequately comply with it. The first caseworker said that the previous case, which remained pending at the time that the Department filed the present case, resulted in APRs for two of mother's children and termination of her parental rights for the third child. *See* § 19-3-604(2)(m) (a court may consider whether parental rights were terminated in a previous case in deciding whether a parent is fit).

¶ 50 The second caseworker testified that, between this case and the previous case, mother had about thirty-one months to address her substance abuse but, during that time, she had demonstrated about sixty days of sobriety at best. The record shows that mother completed an inpatient treatment program in August 2023 but she relapsed shortly after returning to the community and continued to test positive (or miss tests) over the next several months. In December 2023, mother completed another inpatient program before transitioning to a sober living facility in January 2024. Based on this evidence, the caseworker opined that mother was unlikely to meet the child's needs in a reasonable time.

¶ 51    In sum, the record shows that, although mother participated in treatment during this case, she had a significant history of substance abuse and had not demonstrated consistent sobriety, especially outside of a structured environment. *See People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005) (unfitness may be premised on a parent's failure to document sobriety).

¶ 52    Mother asserts that the juvenile court erred because the evidence shows that she achieved sobriety, resolved some child protection concerns, and had a strong bond with the child. But the court considered this evidence and still concluded that mother was unfit and unlikely to become fit in a reasonable time. Because the record supports the court's findings, we may not reweigh the evidence or substitute our judgment for the juvenile court's. *See S.Z.S.*, ¶ 29. We therefore reject mother's assertion.

## V.     Reasonable Efforts

¶ 53     The parents also contend that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate them and reunify them with the child.  We disagree.[2]

### A.     Applicable Law and Standard of Review

¶ 54     Before a juvenile court may find a parent unfit, the court must consider whether the county department of human services made reasonable efforts to rehabilitate parents and reunite families. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. "Reasonable efforts" means the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 55     Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral

---

[2] Citing 42 U.S.C. § 671(a)(15)(D)(iii) and section 19-1-115(7)(b), C.R.S. 2024, the Department and the GAL argue that mother "was not entitled to reasonable efforts" because her parental rights to the child's sibling had been previously terminated.  In light of our conclusion that the Department made reasonable efforts here, we need not address this argument or the cited statutes.

services to available public and private assistance resources; family time; and placement services. § 19-3-208(2)(b). If funding is available, a department must also provide substance abuse treatment services. § 19-3-208(2)(d)(V).

¶ 56     The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. The parent is ultimately responsible for using the services to comply with the plan, *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011), and the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts, *see People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 57     Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error and review de novo

its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

## B.    Analysis

¶ 58    The juvenile court found that the Department made "extensive efforts" to rehabilitate mother and demonstrated a "willingness to engage" father but that those efforts did not result in either parent becoming fit. The court also found that the Department's efforts in the case, along with those in the previous case, were reasonable and the parents "simply failed to take advantage of [the Department's] efforts."

¶ 59    The record supports the juvenile court's findings. The Department offered mother substance abuse treatment during the previous case, but she did not engage. During this case, the Department again offered both inpatient and outpatient treatment services and, as noted above, mother made some progress but ultimately relapsed in the fall of 2023 before re-entering inpatient treatment a few months before the termination hearing. As for father, the record shows that the Department asked him to complete a substance abuse evaluation but he declined because "he believed that he would become incarcerated in the near future."

During the time that father was in the community, he did not cooperate or communicate with the caseworker. The record also shows that the Department arranged for the parents to have supervised family time, which mother mostly attended, but father did not.

¶ 60    In sum, the record supports the juvenile court's finding that the Department provided the parents with the necessary resources to engage with their treatment plans, but they did not take advantage of those resources or were unsuccessful in becoming fit. *See A.V.*, ¶ 12; *J.C.R.*, 259 P.3d at 1285. Nevertheless, the parents assert, for the reasons described below, that the court erred by concluding that the Department had made reasonable efforts. We address and reject each of their contentions.

### 1.    Father

¶ 61    Father asserts that the Department failed to (1) provide him with adequate family time; (2) arrange for services while he was incarcerated; and (3) investigate relatives for placement. We disagree.

¶ 62    First, we reject father's assertion that the Department failed to make reasonable efforts to provide him with family time services.

Recall that father was incarcerated from the beginning of the case until about April 2023 and again from November 2023 until the end of the case.

¶ 63    The record establishes the following:

- During father's initial time in prison, the first caseworker "contacted the prison multiple times to arrange" family time for father, but the prison did not cooperate with the caseworker to set up any visits.

- The Department set up family time services for father shortly after he was released from prison, and he participated in visits for about a month. The second caseworker then allowed father to attend one of mother's visits in October 2023, but he did not appear for the visit. The caseworker also asked father to meet with her to make a new referral, but he never contacted her again.

- After father was reincarcerated, the second caseworker attempted to contact father at DRDC and Colorado Territorial Prison, but she could not reach him before he was moved to a different facility. The caseworker also

attempted to contact father's DOC case manager but received no response.

¶ 64     In sum, we reject father's assertion because the record indicates that the Department attempted to provide him with family time services throughout the case and that any lack of services was attributable to either father's or DOC's noncooperation. *See A.V.*, ¶ 12. Under those circumstances, we cannot say that the Department failed to make reasonable efforts to provide father with family time services. *See My.K.M.*, ¶ 33.

¶ 65     We are not persuaded to reach a different conclusion based on provisions in the recently enacted S.B. 23-039. For example, section 19-3-507(1)(f)(I)(B) now requires a department to provide "[o]pportunities for meaningful family time between" children and incarcerated parents. The statute also requires the department to communicate with a facility to ascertain its ability to facilitate family time "through audio-visual communication technology and arrange for available virtual family time." *Id.* As described above, the record shows that the caseworkers attempted to contact DOC but received no response.

¶ 66　Next, father asserts that the Department did not comply with other provisions of S.B. 23-039 that required reasonable efforts to provide him with services while he was incarcerated. Section 19-3-508(1)(e)(III), C.R.S. 2024, provides that, "[i]f, after the dispositional hearing, the child's parent becomes continuously incarcerated in a department of corrections facility," the caseworker "shall provide information that details the services and treatment available to a parent at the facility . . . where the parent is incarcerated or the caseworker's efforts to obtain the information." As already noted, the record shows that the caseworker attempted to contact the DOC without success. Therefore, we discern no error.

¶ 67　Last, father argues that the Department did not adequately investigate paternal grandmother or maternal relatives as placement options. We disagree.

¶ 68　We are not convinced that the Department had a duty to investigate relatives to satisfy its reasonable efforts obligations because nothing in section 19-3-208 requires it. *See Abu-Nantambu-El v. State*, 2018 COA 30, ¶ 17 ("[W]e may not add words to a statute that do not exist."). Indeed, our supreme court declined to address a similar argument in *People in Interest of B.H.*, because

31

"section 19-3-604(2)(h) doesn't ask the trial court to assess whether the Department mailed family finding letters or explored enough placement options." 2021 CO 39, ¶ 79. Instead, the supreme court construed the argument as "a challenge to the trial court's finding that there weren't less drastic alternatives to termination." *Id.* We address that argument in Part VI. below.

¶ 69    Even assuming, without deciding, that the Department needed to investigate relatives to satisfy its reasonable efforts obligation, we still discern no error.

¶ 70    The record shows that, at the beginning of the case, the Department considered paternal grandmother for placement but ultimately rejected her based on her initial hesitancy about being a placement and then because of concerns that she could not provide for the child's special needs. A few months later, the Department asked the juvenile court to grant the placement providers legal custody of the child because they chose "not to become certified" and it could not "maintain temporary legal custody when a kinship provider [was] not working toward certification." The parents objected and asked the court to place the child with paternal grandmother. The court rejected the parents' request and granted

the Department's motion to award the placement providers legal custody. *See* § 19-3-508(1)(b) ("The court may place the child or youth in the legal custody of . . . kin . . . with or without protective supervision, under such conditions as the court deems necessary and appropriate."). Father does not appeal this decision.

¶ 71 Following the dispositional hearing and because the Department no longer had legal custody of the child, only the juvenile court could change the placement. Therefore, if the parents wanted to change placement to the paternal grandmother, either the parents or paternal grandmother needed to file a motion and ask for a hearing. *See* § 19-3-507(1)(b.7) (noting that, when a child is placed with kin, the court shall hold a hearing to decide whether to change placement); *see also* § 19-3-702(6) (listing the factors that the court must consider in deciding whether to change placement). But no one made a formal request to change placement to paternal grandmother.

¶ 72 As for the maternal relatives, the record shows that they asked for placement only after the dispositional hearing. As noted, because the Department no longer had legal custody, it could not change placements without a court order and therefore nothing

required the Department to investigate them as placement options. Nevertheless, the Department conducted a background check and determined that it could not place the child with maternal relatives because maternal uncle had a criminal conviction for child abuse. *See* Dep't of Human Servs. Reg. 7.304.21(E)(2)(f)(8)(a), 12 Code Colo. Regs. 2509-4 (stating that a department may not place a child with a relative who has been convicted of child abuse as defined in section 18-6-401, C.R.S. 2024).

¶ 73    Father asserts that the Department should have given maternal uncle a "remediation plan," but father provides no authority to suggest that the Department was required to take this action to satisfy reasonable efforts. Additionally, the second caseworker said that the Department would do a remediation plan only if someone asked for a change of placement. But neither the parents nor the maternal relatives ever asked the juvenile court to change placement. *See* § 19-3-702(6); *see also* § 19-3-507(1)(e) (allowing the court to place a child with a relative or kin who has

34

been disqualified as a placement because of a criminal conviction). We therefore discern no error.[3]

### 2.    Mother

¶ 74    Mother contends that the Department did not make reasonable efforts to (1) provide her with housing resources and (2) educate her on the child's special needs.  We disagree.

¶ 75    First, the record shows that mother had housing for most of the case.  For example, mother had an apartment through a voucher from the Denver Housing Authority.  Near the end of October 2023, however, she told the second caseworker that she might lose her apartment and "she needed a letter" from the Department to keep it.  The caseworker said that she tried to get more information from mother about what she needed, but she

---

[3] Father asserts that the Department was required to place the child with the child's grandmother based on statutes that create either a preference for placement with a grandparent or a rebuttable presumption that siblings should be placed together.  *See, e.g.*, §§ 19-1-115(1)(a), 19-3-507(1)(b), C.R.S. 2024.  But the grandparent preference applies when placement with a grandparent is in the child's best interests.  Likewise, the sibling group presumption can be "rebutted by a preponderance of the evidence that placement of the entire sibling group in the joint placement is not in the best interest of a child or of the children."  § 19-3-507(1)(b).  The record indicates that placement with grandmother was not in the child's best interests.

never received an answer. Mother said that, when she lost her housing, she was in jail and, when she was released, she stayed with her grandparents for a short time until there was an "open bed" at her treatment facility. At the time of the termination hearing, mother remained at the sober living house, where she could stay for at least a few more weeks.

¶ 76 Second, the second caseworker said that the Department provided mother with information on housing resources near the end of the case in anticipation of her departure from the sober living facility. Specifically, the caseworker said that she submitted a referral for "community outreach," which was a "resource navigation" service for housing.

¶ 77 We are not persuaded by mother's assertion that the Department failed to make reasonable efforts because it "largely" left mother "to address [the housing] issue on her own." Section 19-3-208 does not explicitly require the Department to provide housing resources. Rather, at most, section 19-3-208(2)(b)(III) requires the Department to provide "[i]nformation and referral services to available public and private assistance resources." And because the record shows that the Department provided mother

with information about housing resources as required by section 19-3-208(2)(b)(III) when it referred her to the community outreach program, we discern no error. *See J.C.R.*, 259 P.3d at 1285 (concluding that the juvenile court did not err where the evidence showed that the department provided the parent with information that she could have used to find housing).

¶ 78 Finally, mother asserts that the Department failed to educate her on the child's special needs, which included feeding issues. Mother's treatment plan required her to understand the child's special needs, but she has not directed us to any specific services in section 19-3-208 that the Department failed to provide in this area. And the record otherwise shows that the Department provided mother with contact information for the child's therapists and arranged for one of the therapists to work with her during visits. In addition, the placement providers arranged for mother to attend therapy sessions virtually, and the placement providers attended visits to discuss with mother techniques they had learned in therapy.

¶ 79 Consequently, nothing in the record establishes that the Department fell short of its duty to provide services. And the record

otherwise shows that mother had access to the resources that she needed to understand the child's needs. We therefore discern no error.

## VI. Less Drastic Alternatives

¶ 80    Finally, the parents argue that the juvenile court erred by finding that there was no viable less drastic alternative to termination. We disagree.[4]

### A. Applicable Law and Standard of Review

¶ 81    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007). Long-term placement may not be a viable alternative to termination if the child

---

[4] Father asserts that the juvenile court considered less drastic alternatives only with respect to mother, but we understand the court's decision as applying equally to both parents even though the court did not mention father in this discussion. At any rate, a juvenile court need not make express findings regarding less drastic alternatives. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 42.

needs a stable, permanent home that can be assured only by adoption. *Z.P.*, 167 P.3d at 214.

¶ 82     To aid the juvenile court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of people the parent identify as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004).  But the department is not obligated to "independently identify and evaluate other possible placement alternatives." *Z.P.*, 167 P.3d at 215.

¶ 83     For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, it must be the "best" option for the child. *A.M.*, ¶ 27.  Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.  And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *B.H.*, ¶ 80.

¶ 84 The parents assert that the juvenile court erred by rejecting an APR to either the maternal relatives or paternal grandmother. We disagree.

¶ 85 As an initial matter, we reject the parents' assertion that the juvenile court erred because the Department did not make reasonable efforts to investigate relatives. As noted above, the record shows that the Department evaluated paternal grandmother and maternal relatives for placement but ultimately rejected them as placement options. *See D.B-J.*, 89 P.3d at 532. And because we have concluded in Part II.C. that the placement providers qualified as "kin" under section 19-1-103(91), we reject the parents' assertions that the Department improperly placed the child with the placement providers to avoid investigating relatives.

¶ 86 Next, the juvenile court specifically rejected an APR to maternal relatives as a less drastic alternative to termination, and the record supports the court's findings. The record shows that maternal aunt and uncle did not have a good relationship with the parents. *See People in Interest of J.M.B.*, 60 P.3d 790, 793 (Colo. App. 2002) (a court may consider the quality of the relationship

40

between the parent and the placement option). And the maternal uncle had a conviction for child abuse as well as two convictions for driving under the influence. *See People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005) (a court can consider the placement option's ability to care for the child).

¶ 87 And although the juvenile court did not specifically reject an APR to paternal grandmother, we cannot say that the court erred by not entering an APR to her. As noted, the record shows that paternal grandmother was hesitant about being a placement for the child and did not demonstrate that she could meet the child's special needs. In any event, even if paternal grandmother was an appropriate placement option, we still discern no error because the court found that an APR, regardless of the placement, was not in the child's best interests because it would not "provide any level of stability and consistency that the child needs." In other words, the record supports the court's decision that the child needed permanency that could be achieved only through adoption, *see Z.P.*, 167 P.3d at 214, and thus the court was required to reject less drastic alternatives and enter termination, *see A.M.*, ¶ 32.

¶ 88 Finally, we reject father's assertion that adoption by the maternal relatives or paternal grandmother was a less drastic alternative to termination because a child cannot be available for adoption until parental rights have been terminated. *See* § 19-5-203(1)(a), C.R.S. 2024 (noting that a child may be available for adoption following an "[o]rder of the court terminating the parent-child legal relationship in a proceeding brought under article 3 or 5 of this title"); *cf. People in Interest of A.R.*, 2012 COA 195M, ¶ 44 (noting that the less drastic analysis requires a court to determine whether there is an option, "short of termination," that would be in the child's best interests).

## VII. Conclusion

¶ 89 The judgment is affirmed.

JUDGE DUNN and JUDGE TAUBMAN concur.