25CA0371 Wierimaa v Cheng 04-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0371
City and County of Broomfield District Court No. 23CV30043
Honorable Mark Warner, Judge

---

Thomas Wierimaa,

Plaintiff-Appellant,

v.

Anna Cheng,

Defendant-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 9, 2026

---

Artemis Law, LLC, Leigh Horton, Denver, Colorado, for Plaintiff-Appellant

The Burnham Law Firm, P.C., Brian D. Teed, Centennial, Colorado, for Defendant-Appellee

¶ 1    Plaintiff, Thomas Wierimaa, appeals the trial court's judgment entered on a jury verdict finding that he assaulted defendant, Anna Cheng, his then-wife, and awarding her $468,750 in damages.  We affirm in part and reverse in part and remand the case to the trial court with directions.

## I.    Background

¶ 2    Cheng has two children from a previous marriage, S.W. and H.C.  She and Wierimaa married in 2017 and had one daughter, B.W., in 2019.  During their relationship, Cheng was mostly unemployed; Wierimaa worked full-time and attended law school.  Wierimaa filed for legal separation in September 2021, and the couple finalized their divorce in January 2023.  During the divorce proceeding, Cheng told people that Wierimaa was abusive to her and the children.

¶ 3    Wierimaa filed the underlying lawsuit on February 10, 2023.  He brought claims of (1) abuse of process; (2) defamation (child abuse); (3) defamation (domestic violence); (4) intentional infliction of emotional distress (public smear campaign); (5) intentional infliction of emotional distress (kidnapping minor child); and

(6) tortious interference with parental relations (September 2022 kidnapping of minor child).[1]

¶ 4    Cheng denied the allegations and filed counterclaims for (1) abuse of process; (2) defamation per se; (3) extreme and outrageous conduct (emotional distress); (4) assault; and (5) battery.  Cheng supported her counterclaims by alleging the following incidents:

- In February 2016, while on vacation in Cancun, Mexico, Wierimaa grabbed Cheng by the wrist, threw her onto a bed, and caused her to fall on a hand mirror, which left her with bruises and a back injury (the Cancun incident).

- On February 4, 2018, Wierimaa disciplined H.C. while watching the Super Bowl.  When Cheng protested, Wierimaa yelled at her and told her to leave the home.  She and the children left (the Super Bowl incident).

---

[1] Wierimaa later amended his complaint and added claims of (7) abuse of process (2023 statements to child protective services); (8) malicious prosecution (2023 statements to child protective services); (9) defamation (false allegations of child abuse after February 14, 2023); (10) defamation (false allegations of domestic abuse after February 14, 2023); and (11) exemplary damages.

2

- On September 8, 2019, Wierimaa yelled at Cheng.  She tried to leave the home with all her children, but Wierimaa would not let her take B.W.  She left with S.W. and H.C. (the September 8 incident).

- On March 10, 2021, Wierimaa became angry because Cheng didn't know he was leaving on a business trip (the March 10 incident).

- On September 16, 2021, Wierimaa told Cheng that he had filed for legal separation and called her a "child," "immature," and a "cunt" (the September 16 incident).

- On March 11, 2022, Wierimaa threatened that he would litigate against Cheng until B.W. turned eighteen (the March 11 incident).

- On July 5, 2022, police came to Cheng's home to perform a welfare check.  During the visit, Cheng contacted Wierimaa and put him on speaker phone.  The officers noted that Wierimaa sounded controlling and threatening (the July 5 incident).

¶ 5    Wierimaa and Cheng filed separate special motions to dismiss under Colorado's anti-SLAPP[2] law, which the court denied. Wierimaa filed a second motion to dismiss, which the trial court partially granted with respect to Cheng's assault claim concerning the Cancun incident (because it was outside the statute of limitations) and allowed her to amend her counterclaims, which she did. She removed the Cancun incident and added more details about the September 8 incident. Specifically, she indicated that when she was getting the children ready that morning, Wierimaa verbally berated her and the children. Cheng went to B.W.'s room to pick her up from her crib and console her after she started crying. B.W.'s crib was in the bedroom's walk-in closet. Wierimaa followed Cheng into the bedroom, continued to yell at her, used his body to block Cheng in the closet, and "physically snatched" B.W. out of Cheng's arms. Cheng left the closet, grabbed S.W. and H.C. along with their things for the day, and then left with the two older children. During this time, Wierimaa continued to berate her,

---

[2] "SLAPP" stands for "strategic lawsuit against public participation." *Hinds v. Foreman*, 2026 CO 9, ¶ 1.

4

saying she was a "horrible mother," a "mistake," and a "horrible person."

¶ 6     Wierimaa moved for summary judgment at the conclusion of discovery, arguing that (1) no battery occurred because there was no physical contact during the alleged events; (2) no assault occurred because Cheng was not placed in apprehension of any immediate physical contact; (3) Cheng could not prove any abuse of process; (4) Cheng's defamation per se claims were barred by the absolute litigation privilege and the doctrine of substantial truth; and (5) Cheng could not prove or establish extreme and outrageous conduct.  The court granted the motion with respect to Cheng's counterclaims of (1) abuse of process; (2) defamation; and (3) extreme and outrageous conduct, but it denied summary judgment with respect to Cheng's assault and battery claims arising from the September 8 incident.

¶ 7     Wierimaa filed two motions in limine.  The first was to exclude evidence of Cheng's dismissed counterclaims and to limit evidence and testimony on Cheng's assault and battery counterclaims to the events that occurred on September 8, 2019.  The second was to exclude evidence of a phone call Wierimaa had with a health care

insurance agent in May 2024 to illustrate his "aggressive character." During the pretrial conference, the court granted Wierimaa's motions because the challenged testimony would be unduly prejudicial. However, the court noted that the evidence could be admitted at trial if it became relevant.

¶ 8     At trial, Cheng testified that she and Wierimaa had the following acrimonious arguments during their relationship:

- During a family trip to India in 2016, Cheng asked Wierimaa to get off his phone during breakfast. An argument ensued, Wierimaa began yelling at Cheng, and Wierimaa went to pack his bags to return home to Denver. Cheng and her children didn't have a flight home, so Cheng begged Wierimaa to return to the hotel room, which he eventually did (the India incident).

- During a family trip to Peru in 2016, Cheng asked Wierimaa to take a picture of her and the children at the base of Machu Picchu, to which Wierimaa responded, "No, you have enough F---ing photos." Wierimaa left Cheng and S.W. and took H.C. (who was then one year old) to the top of Machu Picchu. Cheng and S.W. (who was then five years old) climbed Machu Picchu but didn't reconnect with Wierimaa until they

descended the mountain and found Wierimaa and H.C. at a cafeteria at Machu Picchu's base (the Peru incident).

- Returning from a visit to Toronto in 2017, the family was stopped at the border near Detroit because of a minor issue with Cheng's passport. Cheng and the children sat in a waiting room while Wierimaa paced back and forth, became agitated, and said, "I'm American. I don't need to do this." Wierimaa asked a border agent several times how long they would need to wait. The last time he approached the agent, two officers physically removed Wierimaa and detained him while several people watched and the children started crying (the Detroit incident).

- When the couple was in Krakow, a technician called the couple to let them know that the results of their in vitro fertilization treatment had been unsuccessful and that their embryos weren't viable. Wierimaa yelled at the technician over the phone and told the technician that it was the clinic's fault that the treatment was unsuccessful. The facility subsequently dismissed the couple as clients because of Wierimaa's behavior (the Krakow incident).

- Cheng described the Super Bowl incident and added the following details: On February 4, 2018, Wierimaa was watching the Super Bowl, and S.W. and H.C. were in the basement playing. When the children came up from the basement, they didn't turn off the basement lights. Because H.C. was the last to come up, Wierimaa picked H.C. up by the shoulders, walked him to the basement, and made him turn off the lights. H.C. was scared and crying. When H.C. came upstairs again, Cheng testified that he had a new cut on his back.

- Cheng also expounded on the September 8 incident: On September 8, 2019, B.W. was being fussy, so Cheng stayed with her until 3 a.m. Cheng put B.W. in her crib. At 7 a.m., when Cheng was readying the older children, B.W. started fussing again. Cheng returned to B.W.'s bedroom and grabbed B.W. Wierimaa stood in the doorway, blocked Cheng from leaving, and grabbed B.W. out of her arms before yelling at Cheng, H.C., and S.W. to leave the house.

- On September 26, 2021, Wierimaa yelled at Cheng in front of the children because she was going to take S.W. and H.C. to

the zoo without B.W. When Cheng and the older children returned, B.W. had a red mark on her cheek (the September 26 incident).

¶ 9    Sadie Skattum, a counselor at H.C. and S.W.'s school, testified that she made a child protective services (CPS) report in May 2021 after Wierimaa yelled at the children during pickup. She testified that she met with H.C. and S.W. after the incident and they told her that Wierimaa yelled at them often but that he was never physical. After Wierimaa's counsel objected, Skattum's testimony regarding S.W. and H.C.'s comments was stricken from the record, but the CPS report was admitted into evidence.

¶ 10   Dr. Thomas Pham, B.W.'s pediatrician, also testified at trial. Pham testified that Cheng brought B.W. to his office after the September 26 incident so that he could examine a red mark on B.W.'s cheek. Pham also testified that Cheng was "very concerned. She was scared . . . . [S]he, I think, did fear for her life and feared for her children's lives."

¶ 11   Rebekah Mauldin, an intake caseworker with Broomfield County Human Services, also testified. Mauldin's testimony focused on the CPS report that Skattum, S.W., and H.C. had

9

concerns about B.W. being with Wierimaa because of his yelling. Wierimaa's counsel objected, but the court overruled the objection because Mauldin's testimony concerned information contained in the previously admitted CPS report.

¶ 12     At the close of Wierimaa's case, Cheng's counsel moved for a directed verdict on all of Wierimaa's claims. The court granted a directed verdict on Wierimaa's claims for abuse of process (claims one and seven) and malicious prosecution (claim eight). But it denied Cheng's motion for a directed verdict on Wierimaa's claims for defamation (claims two, three, and nine), intentional infliction of emotional distress (claims four and five), and tortious interference with parental relations (claim six). At the close of Cheng's case, Wierimaa's counsel also moved for a directed verdict on Cheng's assault and battery claims, but the court denied the motion after finding that there was sufficient evidence for the jury to consider them.

¶ 13     The jury found in Cheng's favor on all of Wierimaa's claims and on her assault counterclaim, awarding her $468,750 in damages on that claim. Wierimaa's attorney moved for a new trial under C.R.C.P. 59(d), which the court denied.

## II.    Analysis

Wierimaa contends that (1) the trial court erred by admitting significant and prejudicial inadmissible evidence; (2) the jury's finding that he assaulted Cheng isn't supported by sufficient evidence; (3) the trial court improperly instructed the jury; and (4) the jury's award of $468,750 in damages isn't supported by the evidence.  We disagree with the first three contentions but agree with the fourth.

## A.    Preservation

As an initial matter, Cheng argues that Wierimaa failed to preserve the evidentiary arguments he now raises on appeal because he didn't make contemporaneous objections during trial.  Cheng also asserts that Wierimaa failed to preserve any challenges to the jury instructions.  We agree that some of the issues Wierimaa raises on appeal weren't preserved.

Preservation is a threshold question, and in civil cases, we don't address insufficiently preserved contentions.  *Rinker v. Colina-Lee*, 2019 COA 45, ¶ 22.  An issue is preserved for appeal when it is brought to the trial court's attention and the court has an opportunity to rule on it.  *In re Marriage of Turilli*, 2021 COA 151,

¶ 12. To help us determine whether an issue is preserved, an appellant must state in his opening brief "whether the issue was preserved, and if preserved, the precise location in the record where the issue was raised and where the court ruled." C.A.R. 28(a)(7)(A).

### 1. The Motions in Limine and Cheng's Testimony

¶ 17 In general, a court's definitive ruling on a motion in limine preserves the issues raised therein for appeal. CRE 103(a); *see also Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1330-31 (Colo. 1986) (pretrial ruling on a motion in limine sufficiently preserves an issue for appeal). A party abiding by the court's order need not renew an objection at trial to preserve the issue for appeal. *Bennett v. Greeley Gas Co.*, 969 P.2d 754, 758 (Colo. App. 1998). *But see People v. Dinapoli*, 2015 COA 9, ¶ 19 (When a party "violates the court's pretrial order [excluding evidence] at trial, the opposing party must contemporaneously object to preserve the issue for appeal.").

¶ 18 Wierimaa filed a motion in limine to exclude evidence and testimony of Cheng's dismissed counterclaims and to limit evidence and testimony on her assault and battery counterclaims to the September 8 incident. He argued that any testimony and other evidence about events that fell outside the September 8 incident

were too dissimilar and remote in time and would unduly prejudice him.  He also filed a separate motion in limine seeking to exclude evidence and testimony of a call he had with a health care insurance agent in May 2024 because it occurred after the September 8 incident.  The court made an oral ruling granting both motions in limine, finding that the challenged incidents were remote and dissimilar and that their probative value was substantively outweighed by the danger of undue prejudice.  *See* CRE 403.  But the court noted that it could reconsider its ruling at trial, which placed both parties' attorneys on notice that, if such evidence was sought to be introduced, they needed to make contemporaneous objections to preserve their evidentiary concerns on appeal.  *See, e.g.*, *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (recognizing that trial courts may reconsider evidentiary rulings as the record develops); *see also United States v. Morales-Quinones*, 812 F.2d 604, 609-10 (10th Cir. 1987) (defense counsel had "opened the door" to testimony).  Despite that notice, at trial, Wierimaa's counsel didn't object to Cheng's testimony regarding the India, Peru, Krakow, March 10, or March 11 incidents.  Wierimaa's

counsel did, however, object to Cheng's testimony regarding the Detroit incident.

¶ 19    During a break in Cheng's testimony, the court indicated that there had been "some intermittent objections and sometimes things weren't objected to." It reminded counsel that "if nobody's objecting, I'll just keep letting it in." Following the court's reminder, Wierimaa's counsel lodged contemporaneous objections to Cheng's testimony concerning the September 16, Super Bowl, and July 5 incidents.

¶ 20    Because Wierimaa's counsel didn't contemporaneously object to Cheng's testimony concerning the India, Peru, Krakow, March 10, and March 11 incidents, arguments as to the admissibility of testimony about those incidents are unpreserved, and we won't address them. But because Wierimaa's counsel objected to Cheng's testimony regarding the Detroit, September 16, Super Bowl, and July 5 incidents, arguments as to the admissibility of testimony about those incidents are sufficiently preserved, and we address whether Cheng's testimony about those incidents was properly admitted *infra* Part II.B.

### 2. Pham's Testimony

¶ 21 Wierimaa argues that the trial court erred by allowing Pham to testify that Cheng "fear[ed] for her life and feared for her children's lives" because that testimony was speculative. Again, Wierimaa's counsel didn't object to this testimony at trial. Because this argument is unpreserved, we also decline to review it. *See Gestner v. Gestner*, 2024 COA 55, ¶ 18 ("In civil cases, issues not raised in or decided by the district court generally will not be addressed for the first time on appeal.").

### 3. Jury Instructions

¶ 22 Cheng contends — and we agree — that Wierimaa's arguments regarding the final jury instructions were not preserved.

¶ 23 The jury instructions were the subject of extensive discussion throughout the trial. Both parties' attorneys participated in drafting the instructions and conferred with the trial court on multiple occasions before the instructions were submitted to the jury. The court expressly invited counsel to raise any objections or concerns throughout the instruction drafting process. Wierimaa's counsel identified a wording issue with Jury Instruction No. 13 but later withdrew any objection by affirmatively agreeing to the

15

instruction as written. Counsel for both parties then confirmed on the record that they had no objections to the instructions, which were later finalized and provided to the jury. Because Wierimaa's counsel didn't object to the jury instructions, the court didn't have an opportunity to rule on any issues Wierimaa now raises on appeal. Because the issue was not preserved, we decline to review it. *See* C.R.C.P. 51 (only objections made to jury instructions before they are given to the jury may be considered on appeal); *Voller v. Gertz*, 107 P.3d 1129, 1131 (Colo. App. 2004) (same).

## B. The Trial Court Did Not Err by Admitting Character Evidence

¶ 24   Wierimaa contends that the trial court erred by admitting character evidence relating to the Detroit, September 16, Super Bowl, and July 5 incidents. We disagree.

### 1. Standard of Review and Applicable Law

¶ 25   CRE 404(b)(1) prohibits the introduction of evidence to prove that a person acted in conformity with a specific character trait on a particular occasion. CRE 404(b)(2) does, however, allow the introduction of such evidence for another purpose, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

16

¶ 26    The supreme court articulated a four-part test in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990), to determine the admissibility of "other acts" evidence in a criminal action.  The supreme court later held in *Boettcher & Co. v. Munson*, 854 P.2d 199, 210 (Colo. 1993), that the *Spoto* analysis applies when evaluating whether CRE 404(b) excludes "other acts" evidence in a civil action.  Such evidence is admissible only if (1) the evidence relates to a material fact; (2) the evidence has logical relevance in that the evidence adds to the probability that the material fact is true; (3) the logical relevance of the evidence doesn't depend on an intermediate inference that the litigant has a bad character, which would be employed to support a further inference that the litigant acted in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the evidence's prejudicial impact.  *Id.* (citing *Spoto*, 795 P.2d at 1318).

¶ 27    When reviewing a trial court's evidentiary ruling on the evidence's probative value and prejudicial impact, "a trial court is afforded considerable discretion in passing on the admissibility of evidence, and its determination will not be disturbed on review

17

absent a showing of an abuse of discretion." *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo. 1994).

### 2.    Analysis

¶ 28    Wierimaa argues that Cheng's testimony relating to the Detroit, September 16, Super Bowl, and July 5 incidents fails the *Spoto* test.  Addressing the incidents in turn, we disagree.

### a.    The Detroit Incident

¶ 29    Cheng's testimony concerning the Detroit incident was properly admitted under *Spoto*.  First, the testimony was offered for a proper, noncharacter purpose — to highlight the couple's troubled relationship, which led to Cheng's fear of physical harm during the September 8 incident — rather than to establish that Wierimaa acted in conformity with a violent disposition.  Second, the testimony was logically relevant because the incident informed Cheng's state of mind on September 8 and made her fear of physical harm more probable.  Her description of Wierimaa's agitation at the border, which resulted in his physical restraint and detention while her children cried and others watched, demonstrated a pattern of volatility.  That pattern, in turn, provided context for Cheng's fear on September 8.

¶ 30    Third, the logical relevance of the evidence was independent of any impermissible character inference.  The testimony concerned a specific episode that scared Cheng and was not a generalized claim that Wierimaa possessed a propensity for violence.  Finally, the probative value wasn't substantially outweighed by the danger of unfair prejudice.  While the incident was dramatic, it informed why Cheng may have feared Wierimaa during the September 8 incident.  Under these circumstances, we conclude that the trial court didn't err by admitting the evidence.

### b.    Other Incidents

¶ 31    Wierimaa's challenge to Cheng's testimony regarding the Super Bowl, September 16, and July 5 incidents is unavailing.  Wierimaa doesn't analyze each incident under the applicable framework and instead asserts, in conclusory fashion, that, taken together, they fail the *Spoto* requirements.  Not only does Wierimaa fail to include adequate citations to the record demonstrating where the alleged errors took place, but each incident was offered for a proper, noncharacter purpose — namely, to illuminate the nature of the parties' relationship and to provide context for the September 8 incident.  In that respect, the evidence was logically relevant to a

material issue in the case. The testimony helped explain Cheng's perception of and reaction to Wierimaa's conduct, including her claimed fear, and tended to show a pattern of tense and volatile interactions between the parties.

¶ 32 Further, the probative value of this testimony wasn't substantially outweighed by the danger of unfair prejudice. The incidents demonstrated a pattern of tense or volatile behavior that informed the jury's understanding of the parties' dynamics; they didn't invite a verdict based on an impermissible propensity inference. Accordingly, the trial court didn't abuse its discretion by admitting Cheng's testimony about these incidents.

C. The Trial Court Did Not Err by Admitting Child Hearsay

¶ 33 Wierimaa argues that the trial court erred by admitting prejudicial child hearsay. We disagree.

1. Standard of Review and Applicable Law

¶ 34 Under the child hearsay statute, as relevant here, a child's out-of-court statements are admissible if, after a pretrial hearing, (a) the court finds sufficient safeguards of reliability, and (b) the child is unavailable as a witness and there is sufficient corroborative evidence. § 13-25-129(5)(a)-(b), C.R.S. 2025. We

review the admission of child hearsay statements for an abuse of discretion. *People in Interest of G.E.S.*, 2016 COA 183, ¶ 47.

### 2. Analysis

¶ 35 Wierimaa contends that the trial court abused its discretion by (1) admitting Skattum's testimony that S.W. and H.C. told her that Wierimaa yelled at them every day; (2) allowing Cheng's testimony that the children wanted to go home to check on B.W.; and (3) admitting Mauldin's testimony that S.W. and H.C. were concerned about B.W. being with Wierimaa because of his yelling. We disagree with each contention.

¶ 36 First, the portion of Skattum's testimony that Wierimaa challenges on appeal was stricken from the record after Wierimaa's counsel objected.[3] Once stricken, the testimony was no longer before the jury for deliberative purposes. The same is true for the portion of Cheng's testimony stating that the children wanted to go home to check on B.W. Wierimaa's counsel immediately objected, and Cheng's counsel withdrew the question that elicited the response. *See People v. Jamison*, 2018 COA 121, ¶ 37.

---

[3] Regardless, Skattum's challenged statements were also admitted through the CPS report.

21

¶ 37    Second, Mauldin's testimony was limited to the information contained in the prepared CPS report, which was previously admitted as evidence. Because the testimony was cumulative of evidence already properly before the jury, Mauldin's testimony didn't introduce new or prejudicial information. Accordingly, the trial court didn't abuse its discretion by allowing testimony that reiterated previously admitted evidence.

## D.    There Was Sufficient Evidence Supporting the Jury's Finding That Wierimaa Assaulted Cheng

¶ 38    Wierimaa also contends that there was insufficient evidence to support the jury's finding that he assaulted Cheng. We disagree.

### 1.    Standard of Review and Applicable Law

¶ 39    "When sufficiency of the evidence is challenged on appeal, we must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the verdict." *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1106 (Colo. App. 2004). We review the entire record to determine if there is competent evidence to support the jury's verdict. *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 34.

¶ 40    We "are bound by the jury's findings where there is sufficient competent evidence in the record to support the finding[] [and] where the jury makes the finding on conflicting evidence." *Vigil v. Pine*, 490 P.2d 934, 936 (Colo. 1971); *see Brewer v. Am. & Foreign Ins. Co.*, 837 P.2d 236, 238 (Colo. App. 1992) ("Unless clearly erroneous and unsupported by the record, the findings of the jury must be accepted on review."). "It is the jury's sole province to determine the weight of the evidence and the credibility of witnesses, and to draw all reasonable inferences of fact therefrom." *Morales v. Golston*, 141 P.3d 901, 906 (Colo. App. 2005).

¶ 41    To prevail on her assault claim, Cheng had to prove by a preponderance of the evidence that (1) Wierimaa acted either with the intent of making physical contact with Cheng or putting her in apprehension of such contact; (2) Cheng was placed in apprehension of imminent contact by Wierimaa's conduct; and (3) such contact was or appeared to be harmful or offensive. *Adams v. Corr. Corp. of Am.*, 187 P.3d 1190, 1198 (Colo. App. 2008).

## 2.    Analysis

¶ 42    With respect to intent, the jury heard evidence from which it reasonably could have found that Wierimaa intended to put Cheng

23

in apprehension of immediate physical contact or to cause offensive or harmful contact. Intent is rarely susceptible of direct proof and may be inferred from words, conduct, and the surrounding circumstances. *See Se. Colo. Water Conservancy Dist. v. Twin Lakes Assocs., Inc.*, 770 P.2d 1231, 1237 (Colo. 1989). Cheng described patterns of Wierimaa's hostility, intimidation tactics, and physical domination that occurred in private, in public, and in the presence of the parties' children. Cheng also described how, during the September 8 incident, Wierimaa stood over her, glared, said, "[F]uck you. Fuck off" in front of the children, and physically blocked her from leaving the closet with B.W. When Cheng asked Wierimaa to move, he yelled, "Give me my daughter. I'm going to call the cops on you," and forcibly grabbed B.W. from Cheng's arms. The older children ran down a nearby hallway and hid under a bed.

¶ 43     From Cheng's testimony, the jury reasonably could have inferred that Wierimaa intended to place Cheng in apprehension of immediate physical contact or to subject her to offensive or harmful contact. We don't reassess witness credibility, reweigh evidence, or substitute our judgment for that of the jury. *See People in Interest of A.J.L.*, 243 P.3d 244, 256 (Colo. 2010); *Ovation Plumbing, Inc. v.*

*Furton*, 33 P.3d 1221, 1225 (Colo. App. 2001) (A "jury's verdict will not be disturbed if there is *any* support for it in the record." (citation omitted)).

¶ 44    Next, Wierimaa argues that Cheng "never directly testified about her apprehension during the incident." We disagree. On direct examination, Cheng was asked, "On September 8th, 2019, did Wierimaa put you in a situation where you felt an apprehension of fear for physical harm?" Cheng responded, "Yes." Although Wierimaa contends that the jury should have discounted Cheng's testimony because he never expressly threatened physical harm or the use of force, that argument is unpersuasive because neither threatening language nor actual contact are required to establish assault. *See Adams*, 187 P.3d at 1198. Rather, Cheng's testimony, if believed, was sufficient to establish that she was apprehensive of physical harm, and the absence of an explicit verbal threat doesn't render the evidence legally insufficient. Moreover, as discussed, it isn't our role to reweigh the evidence or substitute our judgment for that of the jury. *See Morales*, 141 P.3d at 906. Viewing the evidence in the light most favorable to the verdict, the jury reasonably could have found that Cheng experienced apprehension

of physical harm under the circumstances presented.  We therefore decline to disturb that finding.

### E. The Jury's Damages Award Was Not Supported by the Evidence

¶ 45    Wierimaa argues that the jury's damages award to Cheng was not supported by the evidence.  We agree.

#### 1. Applicable Law and Standard of Review

¶ 46    Colorado allows recovery for noneconomic damages up to $250,000, adjusted for inflation.  § 13-21-102.5(3)(a)(I), C.R.S. 2025.  In enacting limitations on damages for noneconomic loss or injury, the legislature has defined a "[n]oneconomic loss or injury" as a nonpecuniary harm where the person suffered direct or primary loss or injury, including pain and suffering, inconvenience, emotional stress, and impairment to their quality of life.  § 13-21-102.5(2)(b).  This is a statute of general application, *Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 907 (Colo. 1993), which accounts for damages for both real injuries and emotional distress, *see Averyt v. Wal-Mart Stores, Inc.*, 265 P.3d 456, 462-63 (Colo. 2011); *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 417 (Colo. 2004).  "Because damages for loss of enjoyment, annoyance,

discomfort, and inconvenience 'by their very nature include a mental or emotional component,' limited testimony about a plaintiff's reactions or feelings may be used to describe these noneconomic damages." *Hendricks v. Allied Waste Transp., Inc.*, 2012 COA 88, ¶ 27 (quoting *Webster v. Boone*, 992 P.2d 1183, 1186 (Colo. App. 1999)).

¶ 47    One claiming damages, however, must submit "substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1383 (Colo. 1993).

> Substantial evidence is that which is probative, credible, and competent. It is evidence of a character that would warrant a reasonable belief in the existence of facts supporting a particular finding, without regard to the existence of contradicting testimony or contradictory inferences. Accordingly, if there is no competent evidence to support a damage award, it is clearly erroneous.

*Palmer v. Diaz*, 214 P.3d 546, 552 (Colo. App. 2009).

¶ 48    The amount of damages to award to the prevailing party in a jury trial is within the sole province of the jury. *Averyt*, 265 P.3d at 462. On appeal, a jury's damages award "will not be disturbed

unless it is completely unsupported by the record or if it is so excessive as to indicate that the jury acted out of passion, prejudice, or corruption." *Id.* When a damages award is challenged, the appellate court must view the record in the light most favorable to the prevailing party and draw every inference in favor of that party. *Id.* We will not disturb an award of damages unless it is completely unsupported by the record. *See Husband v. Colo. Mountain Cellars, Inc.*, 867 P.2d 57, 60 (Colo. App. 1993) ("If there is evidence to support a jury's findings as to damages, those findings may not be overturned . . . .").

## 2. Analysis

¶ 49 Wierimaa asserts that the jury's award of $468,750 was excessive because (1) it was likely that the jury applied exemplary damages to Cheng's assault counterclaim because the order of the jury instructions and lack of clarity confused the jury;[4] (2) testimony relating to evidence outside the September 8 incident

---

[4] Wierimaa sought exemplary damages; Cheng didn't. But the exemplary damages instruction didn't clarify that it applied only to Wierimaa's claims. Because this instruction immediately preceded the instruction on apprehension relating to Cheng's claims, Wierimaa claims the jury was likely confused.

28

created unfair bias, prejudice, and passion against him; (3) Cheng didn't suffer a physical or emotional injury in connection with the September 8 incident; and (4) the record doesn't support the jury's award.

¶ 50 First, as we have noted *supra* Part II.A.3., Wierimaa's counsel didn't object to the court's jury instructions. Because any claim of instructional error is unpreserved, we decline to review Wierimaa's argument on that basis. Second, to the extent Wierimaa claims that evidence admitted outside the September 8 incident created unfair juror bias, prejudice, or passion against him, either those claims were unpreserved, as we have noted *supra* Part II.A.1., or the evidence was properly admitted, as we discussed *supra* Part II.B.2. Moreover, Wierimaa's claims of juror bias, prejudice, and passion are speculative and underdeveloped. *See People v. Thompson*, 2017 COA 56, ¶ 199 (declining to address a contention on appeal when the premise is "entirely speculative"); *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 604 (Colo. App. 2007) ("We will not address . . . underdeveloped arguments.").

¶ 51 Third, we aren't persuaded by Wierimaa's argument that Cheng didn't suffer an emotional injury. The jury was instructed

that, in determining actual damages, it could consider "noneconomic losses or injuries . . . [Cheng] has had to the present time or . . . will probably have in the future, including: physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, or impairment of the quality of life." The jury heard testimony from Cheng describing years of emotional abuse and her turbulent relationship with Wierimaa, which informed her state of mind on September 8. Cheng also directly testified that she was fearful on September 8, and the jury could have inferred that she felt anxious and stressed.

¶ 52    However, we do agree with Wierimaa's assertion that the jury's damages award isn't supported by the record. In cases where the appellate court affirmed a jury's award of noneconomic damages, the plaintiff had presented testimony of pain, suffering, mental anguish, or a reduced quality of life. *See, e.g.*, *Averyt*, 265 P.3d at 462-63 (the plaintiff provided ample testimony she suffered from chronic pain that induced personality changes, depression, difficulty sleeping, and difficulty concentrating after her injury); *Schuessler v. Volter*, 2012 COA 86, ¶ 56 (the plaintiff testified to his emotional distress and anger at not receiving benefits, the impact of

working in pain when he needed time to recover, and the financial pressure and anxiety from not having money to cover his costs); *Colwell v. Mentzer Invs., Inc.*, 973 P.2d 631, 639 (Colo. App. 1998) (the plaintiff's experts testified that while the plaintiff could continue to work as a teacher, eventually, the quantity and quality of her teaching would likely be reduced, and there was a high likelihood that the plaintiff would end up in a wheelchair, given her worsening symptoms).

¶ 53 Here, the sole reference in the record to noneconomic damages appears in a single page of Cheng's testimony, in which she alluded generally to fear of physical harm. Although Cheng testified that she felt fear during the September 8 incident, she never developed that testimony or indicated that, at the time of the incident or thereafter, she experienced physical or mental pain, emotional distress (apart from the immediate fear), anguish, inconvenience, or humiliation, or that the incident impaired her quality of life. Likewise, neither Cheng nor her witnesses testified that the September 8 incident left her unable to work, that she suffered economic loss, or that she experienced other symptoms associated with an award of noneconomic damages. Simply put, Cheng failed

31

to submit substantial evidence supporting the jury's award of almost half-a-million dollars. Further, Cheng's counsel didn't articulate a measurable amount of harm or even request damages during closing argument.

¶ 54    Thus, the jury's award for damages was excessive and unsupported by the record. Accordingly, we reverse that award. When an appellate court determines that the verdict was only excessive and not the result of bias or prejudice, "the court may order a remittitur and alternatively authorize a new trial on damages alone if the plaintiff refuses to accept the remittitur." *Higgs v. Dist. Ct.*, 713 P.2d 840, 861 (Colo. 1985); *see also Bassett v. O'Dell*, 498 P.2d 1134, 1135 (Colo. 1972) ("Numerous cases have considered and approved the practice of granting partial retrials on the issue of damages alone where liability was clearly established.").

¶ 55    Accordingly, on remand, the trial court is directed to offer Cheng the option of remittitur, and, if she doesn't accept, to order a new trial on the amount of noneconomic damages for the assault claim. *See Jagow v. E-470 Pub. Highway Auth.*, 49 P.3d 1151, 1161 (Colo. 2002) (affirming the court of appeals' judgment directing the trial court to offer the plaintiff the option of remittitur, and if

remittitur was not accepted, to hold a new trial on damages to the remaining property).

## F.    Appellate Attorney Fees

¶ 56    We deny Wierimaa's request for attorney fees on appeal and his request to determine appellate fees through a contempt hearing on remand because he has prevailed on appeal only as to the damages award; Cheng has prevailed on all other issues.  *See* C.A.R. 39.1.

## III.    Disposition

¶ 57    We affirm the portion of the judgment that found in Cheng's favor on all of Wierimaa's claims and on her assault counterclaim. We reverse the jury's award of damages on Cheng's assault counterclaim and remand the case to the trial court for remittitur, or, if Cheng objects, a new trial on damages.

JUDGE J. JONES and JUDGE LUM concur.